**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

RONNIE HAGEL, JUDY AND
ROBERT WILSON, FELIPE LOZANO JR.
KENNETH HUNTER, JAMES AND
PATRICIA MOODY, DR. JOHN NATSIS
DOROTHY HUNTER and DONNA BOROVICH,
Individually and on Behalf of All Persons
Similarly Situated,

      Plaintiffs,

v.

STERLING BANK AND TRUST, FSB;
ALEXANDER J. AJEMIAN;
PATRICK D. QUINLAN; LEE P. WELLS;
C. THOMAS WELLS, JR., KEITH D. PIETIELA;
JAMES B. QUINLAN; D. MICHAEL JEHLE;
RONALD B. DARGA; JOHN P. O'LEARY;
DENNIS AGRESTA; ARLENE A. DOYLE;
DANIEL J. O'CONNOR; and CHERYL SWAIN,
Jointly and Severally,

      Defendants.

**00-74329**
**ARTHUR J. TARNOW**

Case No.
Hon.
Magistrate Judge

**MAGISTRATE JUDGE CARLSON**
Wayne County Circuit Court
Case No. 00-028028-CK
Hon. Paul S. Teranes

U.S. DISTRICT COURT CLERK
EAST DIST MICH
DETROIT
'00 SEP 28 P3 55

_____/

Jerome G. Quinn (P19156)
Attorneys for Plaintiffs
74 W. Long Lake Rd.
Suite 203
Bloomfield Hills, MI 48304
(248) 642-0023

Larry G. Mason (P17183)
Co-Counsel for Plaintiffs
Larry G. Mason, P.C.
1530 Rochester Rd.
Royal Oak, MI 48067
(248) 547-5310

Larry K. Griffis (P14385)
Christopher A. Chekan (P54969)
Jaffe, Raitt, Heuer & Weiss, P.C.
Attorneys for Sterling Bank and Trust, FSB
One Woodward Avenue, Ste. 2400
Detroit, MI 48226
(313) 961-8380

_____/

## NOTICE OF REMOVAL

0733111.01

To:     The Judges of the United States District Court
        for the Eastern District of Michigan, Southern Division

        Defendant Sterling Bank and Trust, FSB by its attorneys, Jaffe, Raitt, Heuer &

Weiss, P.C., file this Notice of Removal of the above-captioned lawsuit to the United

States District Court for the Eastern District of Michigan, Southern Division, pursuant to

28 U.S.C. §1441, et seq. and in support of its removal states:

        1.      On or about August 24, 2000, a civil lawsuit was commenced and is now

pending in the Circuit Court for the County of Wayne, Michigan, entitled *Ronnie Hagel,

et al. v Sterling Bank and Trust, FSB, et al.*, Case No. 028028-CK (Judge Paul S. Teranes) in

the records of that Court (the "Lawsuit").

        2.      The Lawsuit is one in which this Court has original jurisdiction on the

basis that one or more of the causes of action in the Lawsuit are founded on a claim or

right arising under the laws of the United States, specifically in this case, the Securities

Act of 1933, 15 U.S.C. §77(a) et seq. and is one which may be removed to this Court by

Defendant Sterling Bank and Trust pursuant to the provisions of 28 U.S.C. §1441(b), the

other statutes described below and the procedures set forth in 28 U.S.C. §1446.

        3.      Based on (1) the allegations in the Complaint filed in the Lawsuit, (2) the

information and belief of Sterling Bank and Trust without the ability to take discovery

at this early stage in the Lawsuit, and (3) reasonable implications from the above, this

case is removable to the United States District Court pursuant to 15 U.S.C. §77v, 15

U.S.C. §77p(c) and 15 U.S.C. §77r(b). Sterling Bank and Trust makes this statement

without admitting any of the facts alleged in plaintiff's Complaint and without

admitting any of the facts necessary for removal under the statutes cited in this Paragraph and Paragraph 2 above.

4.      Defendant Sterling Bank and Trust was served with and first received a copy of the Complaint in the Lawsuit on September 1, 2000 and this Notice of Removal is being filed on September 28, 2000, i.e., within the 30 day period as provided in 28 U.S.C. §1446(b).

5.      A Civil Coversheet has been provided to the U.S. District Court Clerk upon the filing of this Notice of Removal.  That Civil Coversheet states, and this Notice of Removal confirms, that there is a pending case in this Court in which substantially similar evidence will be offered, related parties are present, and arises out of the same transactions or occurrences.  That currently pending case is *David Beanne, et al. v Sigma Financial Corporation, et al.*, Civil Action No. 99-75813 before the Honorable Anna Diggs Taylor and Magistrate Judge Marc L. Goldman.  The *Beane* case and this Lawsuit are both class actions wherein the plaintiffs are alleged to be the same exact class.  All defendants in this case are also defendants in the *Beane* case.

6.      A copy of all process, pleadings and orders in the Lawsuit served upon Sterling Bank and Trust have been provided to the United States District Court Clerk upon the filing of this Notice of Removal.

7.      Counsel for the adverse parties are Jerome G. Quinn (P19156), 74 W. Long Lake Road, Suite 203, Bloomfield Hills, Michigan 48304 and Larry G. Mason (P17183), 1530 Rochester Road, Royal Oak, Michigan 48067.  A copy of this Notice of Removal and all attachments have been served upon counsel for the adverse parties.  Those same

documents are being filed with the Clerk of the Court of the Wayne County Circuit Court.

Respectfully submitted,

JAFFE, RAITT, HEUER & WEISS, P.C.

By: _____

Larry K. Griffis (P-14385)
Christopher A. Chekan (P54969)
Attorney for Sterling Bank & Trust
One Woodward Avenue, Suite 2400
Detroit, Michigan 48226
(313) 961-8380

Dated:  September 28, 2000

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RONNIE HAGEL, JUDY AND
ROBERT WILSON, FELIPE LOZANO JR.
KENNETH HUNTER, JAMES AND
PATRICIA MOODY, DR. JOHN NATSIS
DOROTHY HUNTER and DONNA BOROVICH,
Individually and on Behalf of All Persons
Similarly Situated,

**00-74329**

Case No.
Hon.
Magistrate Judge

Plaintiffs,

**ARTHUR J. TARNOW
MAGISTRATE JUDGE CARLSON**

Wayne County Circuit Court
Case No. 00-028028-CK
Hon. Paul S. Teranes

v.

STERLING BANK AND TRUST, FSB;
ALEXANDER J. AJEMIAN;
PATRICK D. QUINLAN; LEE P. WELLS;
C. THOMAS WELLS, JR., KEITH D. PIETIELA;
JAMES B. QUINLAN; D. MICHAEL JEHLE;
RONALD B. DARGA; JOHN P. O'LEARY;
DENNIS AGRESTA; ARLENE A. DOYLE;
DANIEL J. O'CONNOR; and CHERYL SWAIN,
Jointly and Severally,

Defendants.

/

| | |
|---|---|
| Jerome G. Quinn (P19156)<br>Attorneys for Plaintiffs<br>74 W. Long Lake Rd.<br>Suite 203<br>Bloomfield Hills, MI 48304<br>(248) 642-0023 | Larry G. Mason (P17183)<br>Co-Counsel for Plaintiffs<br>Larry G. Mason, P.C.<br>1530 Rochester Rd.<br>Royal Oak, MI 48067<br>(248) 547-5310 |

Larry K. Griffis (P14385)
Christopher A. Chekan (P54969)
Jaffe, Raitt, Heuer & Weiss, P.C.
Attorneys for Sterling Bank and Trust, FSB
One Woodward Avenue, Ste. 2400
Detroit, MI 48226
(313) 961-8380

/

## CERTIFICATE OF SERVICE

I, Valeri L. Mangindin, certify that on September 28, 2000, I served the NOTICE OF REMOVAL and PROOF OF SERVICE by placing true copies thereof in a sealed envelope, with postage prepaid thereon, and had it delivered to the nearest United States Postal Office addressed to the following:

Jerome G. Quinn (P19156)           Larry G. Mason (P17183)
Attorneys for Plaintiffs           Co-Counsel for Plaintiffs
74 W. Long Lake Rd.                Larry G. Mason, P.C.
Suite 203                          1530 Rochester Rd.
Bloomfield Hills, MI 48304         Royal Oak, MI 48067


Valeri L. Mangindin

0733111.01                              6

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RONNIE HAGEL, JUDY AND
ROBERT WILSON, FELIPE LOZANO JR.
KENNETH HUNTER, JAMES AND
PATRICIA MOODY, DR. JOHN NATSIS
DOROTHY HUNTER and DONNA BOROVICH,
Individually and on Behalf of All Persons
Similarly Situated,

        Plaintiffs,

v.

STERLING BANK AND TRUST, FSB;
ALEXANDER J. AJEMIAN;
PATRICK D. QUINLAN; LEE P. WELLS;
C. THOMAS WELLS, JR., KEITH D. PIETIELA;
JAMES B. QUINLAN; D. MICHAEL JEHLE;
RONALD B. DARGA; JOHN P. O'LEARY;
DENNIS AGRESTA; ARLENE A. DOYLE;
DANIEL J. O'CONNOR; and CHERYL SWAIN,
Jointly and Severally,

        Defendants.

## 00-74329

## ARTHUR J. TARNOW
Case No.
Hon.
Magistrate Judge

## MAGISTRATE JUDGE CARLSON

Wayne County Circuit Court
Case No. 00-028028-CK
Hon. Paul S. Teranes

_U.S. DIST. COURT CLERK
EAST DIST. MICH
DETROIT
'00 SEP 28  P3 55_

---

| Jerome G. Quinn (P19156) | Larry G. Mason (P17183) |
|---|---|
| Attorneys for Plaintiffs | Co-Counsel for Plaintiffs |
| 74 W. Long Lake Rd. | Larry G. Mason, P.C. |
| Suite 203 | 1530 Rochester Rd. |
| Bloomfield Hills, MI 48304 | Royal Oak, MI 48067 |
| (248) 642-0023 | (248) 547-5310 |

Larry K. Griffis (P14385)
Christopher A. Chekan (P54969)
Jaffe, Raitt, Heuer & Weiss, P.C.
Attorneys for Sterling Bank and Trust, FSB
One Woodward Avenue, Ste. 2400
Detroit, MI 48226
(313) 961-8380

---

## CERTIFICATE OF SERVICE

I, Valeri L. Mangindin, certify that on September 28, 2000, I served the NOTICE

OF REMOVAL and PROOF OF SERVICE by hand delivering true copies to the

following:

Clerk of the Court
Wayne County Circuit Court
2 Woodward Avenue
Detroit, MI 48226

_Valeri L. Mangindin_
Valeri L. Mangindin

0733111.01                                        8

STATE OF MICHIGAN
THIRD CIRCUIT COURT



**SUMMONS AND
RETURN OF SERVICE**

CASE NO.

00-028028 CK

| COURT<br>ADDRESS: 2 WOODWARD AVENUE, DETROIT, MICHIGAN 48226 | COURT<br>TELEPHONE NO. (313) 224-    0256 |
|---|---|

THIS CASE ASSIGNED TO JUDGE: PAUL S. TERANES          Bar Number: 21332

| PLAINTIFF | DEFENDANT |
|---|---|
| HAGEL RONNIE          PL 01  VS | STERLING BANK AND TRUST    DF  11 |
| **PLAINTIFF'S ATTORNEY** | c/o Larry Griffis, Esq.<br>Jaffe, Raitt, Heuer & Weiss, P.C.<br>One Woodward Ave., #2400<br>Detroit, MI  48226 |
| QUINN JEROME G<br>(P-17156)<br>1025 S WOODWARD<br>STE 170<br>BLOOMFIELD HILLS   MI  48013<br>313-333-2660 | |

| CASE FILING FEE | JURY FEE |
|---|---|
| PAID | PAID |

| ISSUED | THIS SUMMONS EXPIRES | DEPUTY COUNTY CLERK |
|---|---|---|
| 0/25/00 | 11/24/00 | ANTOINETTE OLSON |

*This summons is invalid unless served on or before its expiration date.          Teola P. Hunter — Wayne County Clerk

**NOTICE TO THE DEFENDANT:** In the name of the people of the State of Michigan you are notified:
1. You are being sued.
2. YOU HAVE 21 DAYS after receiving this summons to file an answer with the court and serve a copy on the other party or to take other lawful action (28 days if you were served by mail or you were served outside this state).
3. If you do not answer or take other action within the time allowed, judgment may be entered against you for the relief demanded in the complaint.

☐ There is no other pending or resolved civil action arising out of the same transaction or occurrence as alleged in the complaint.
☐ A civil action between these parties or other parties arising out of the transaction or occurrence alleged in the complaint has been previously filed in ____U.S. District_____ Court.
☐ There is no other pending or resolved action within the jurisdiction of the family division of circuit court involving the family or family members of the parties.
☐ An action within the jurisdiction of the family division of the circuit court involving the family or family members of the parties has been previously filed in _____Court.

The docket number and assigned judge of the civil/domestic relations action are:

| Docket no. | Judge | Bar no. |
|---|---|---|
| 99-CV-75813 | Anna Diggs Taylor | P12773 |

The action  ☒ remains  ☐ is no longer   pending.

I declare that the complaint information above and attached is true to the best of my information, knowledge, and belief.

8/31/00
Date                              Signature of attorney/plaintiff

**COMPLAINT IS STATED ON ATTACHED PAGES. EXHIBITS ARE ATTACHED IF REQUIRED BY COURT RULE.**
If you require special accommodations to use the court because of disabilities, please contact the court immediately to make arrangement.

FORM NO. WC101
REV. (3-98)   MC 01 (10/97)     **SUMMONS AND RETURN OF SERVICE**     MCR 2.102(B)(11), MCR 2.104, MCR 2.107, MCR 2.113(C)(2)(a), (b), MCR 3.206 (A)
DEFENDANT



**STATE OF MICHIGAN**
**CIRCUIT COURT FOR THE COUNTY OF WAYNE**

RONNIE HAGEL, JUDY AND
ROBERT WILSON, FELIPE LOZANO JR.
KENNETH HUNTER, JAMES AND
PATRICIA MOODY, DR. JOHN NATSIS
DOROTHY HUNTER and DONNA BOROVICH,
Individually and on Behalf of All Persons
Similarly Situated,

      Plaintiffs,

      vs.

STERLING BANK AND TRUST, FSB;
ALEXANDER J. AJEMIAN;
PATRICK D. QUINLAN; LEE P. WELLS;
C. THOMAS WELLS, JR., KEITH D. PIETIELA;
JAMES B. QUINLAN; D. MICHEAL JEHLE;
RONALD B. DARGA; JOHN P. O'LEARY;
DENNIS AGRESTA; ARLENE A. DOYLE;
DANIEL J. O'CONNOR; and CHERYL SWAIN,
Jointly and Severally,

      Defendants.

| | |
|---|---|
| Jerome G. Quinn (P19156) | Larry G. Mason (P17183) |
| Attorneys for Plaintiffs | Co-Counsel for Plaintiffs |
| 74 W. Long Lake Rd. | Larry G. Mason, P.C. |
| Suite 203 | 1530 Rochester Rd. |
| Bloomfield Hills, MI 48304 | Royal Oak, MI 48067 |
| (248) 642-0023 | (248) 547-5310 |

There are no other civil actions pending between the above-
named Plaintiffs and Defendants for all of the acts,
transactions and occurrences alleged. However,
Defendants have been sued by other Plaintiffs in David
Beane, et al., 99-75813-AA which is pending in the United
States District Court for the Eastern District of Michigan,
Southern Division before the Honorable Judge Anna Diggs
Taylor and some of the Defendants may be Defendants in
other pending actions but by other Plaintiffs.

**COMPLAINT**

NOW COME Plaintiffs, by and through their attorneys, LAW OFFICES OF JEROME G. QUINN, P.C. and LAW OFFICES OF LARRY G. MASON, P.C., in their individual capacities and as representatives of class of persons of which they are a member and who have sustained similar injuries and damages, and, pursuant to the provision of Michigan Rules of Court, Rule 3.501, hereby complain against the above-named Defendants as follows:

## GENERAL ALLEGATIONS

1.      The amount in controversy exceeds $25,000.00.

2.      Plaintiffs Ronnie Hagel, Judy and Robert Wilson, Kenneth Hunter, James and Patricia Moody, John Natsis, and Donna Borovich are residents of the State of Michigan. Dorothy Hunter is a resident of the State of Ohio. Felipe Lozano, Jr. is a resident of the State of Texas. Plaintiffs seek to bring this cause of action individually and on behalf of all persons whose investments fall within the applicable statute of limitations.

3.      That, as will be more fully set forth below, this case arises out of the failure of MCA Financial Corporation (MCA) and its sale of investments of real estate pools. Defendants Patrick D. Quinlan, James P. Quinlan, Lee P. Wells, and C. Thomas Wells, Jr. are residents of the City of Gross Pointe and the County of Wayne and did collectively own 67% of the outstanding stock of MCA at times relevant to the issues herein. Further, the vast majority of the property involved in the real estate pools was located in the City of Detroit and Highland Park, Michigan. Further, said Defendants did own Rimco Corporation which operated within the City of Detroit where it was closely intertwined with the activities complained of herein.

2

4.     That at all times relevant to the issues herein, the individual Defendants mentioned in the immediate preceding paragraphs were officers and directors of MCA.

5.     That at all times relevant to the issues herein, Defendants Alexander J. Ajemian, Patrick D. Quinlan, Lee P. Wells, Keith D. Pietiela, James B. Quinlan, D. Michael Jehle, C. Thomas Wells, Jr., Ronald B. Darga, John P. O'Leary, Dennis Agresta, Arlene A. Doyle, Daniel J. O'Connor and Cheryl Swain were residents of the State of Michigan and officers and directors of MCA.

6.     That at all times relevant to the issues herein, Defendant Sterling Bank and Trust, FSB (Sterling) was and still is a federal saving institution with business offices located in Southfield, Michigan and conducting extensive business activities within Wayne County as related to the activities of MCA and the sale of real estate pool investments.

7.     The allegations of negligence, breach of fiduciary duty and other wrongdoing, including the violation of securities laws, are acts which occurred in Wayne County.

8.     That the class period  covers the time spanned from January 1, 1990 through February 30, 1999.

### CASE SYNOPSIS

9.     This case involves the sale to investors of interests in Pools of income-generating real estate.  The investment product is referred to in the prospectuses issued by Defendants as "Real Estate Pass-Through Certificates."  In other portions of the relevant materials issued by Defendants the investment product is referred to as "Real Estate Interests" and "Pools."  MCA was the issuer.   The Pool Pass-Through

3

Certificates are securities and therefore the conduct of persons involved in their sale is subject to the requirements of the Michigan Uniform Securities Act and the Securities Act of 1933.   **Substantial portion of the factual allegation· set forth in this complaint are based upon a report filed by Timothy G. Skillman, an employee of BBK, Ltd, which is the Court appointed conservator in bankruptcy.  The report was filed In the bankruptcy division of the US District Court for the Eastern District of Michigan, Southern Division for case number 99-42172 et al.**

10.    The investors in the Pool Pass-Through Certificates are mostly retirees who purchased the Pool Pass-Through Certificates for their IRA accounts.  The Pool Pass-Through Certificates allegedly consisted of a percentage share in Pools of real-estate-related holdings consisting of land contracts and mortgages purportedly secured to properties and based on no more than 90% of said properties' fair market value.  In fact, most.of the properties were occupied by renters, not purchasers with ownership or equitable interest and were encumbered with mortgages several hundred times in excess of their fair market value. (See paragraph five.)   MCA Financial Corporation (MCA) designed and directed the investment scheme and Sigma Financial Corporation (Sigma) acted as underwriter.  Patrick D. Quinlan, James P. Quinlan, Lee P. Wells and C. Thomas Wells, Jr. collectively own sixty-seven percent (67%) of the outstanding stock of MCA and are control persons of MCA and its wholly-owned subsidiaries.

11.    MCA purchased the properties for the Pools from Rimco Financial Corporation (Rimco), which is the parent corporation of several other companies related to the scheme.  Rimco is located in the City of Detroit and is owned equally by Patrick

4

D. Quinlan, Lee G. Rogers and Lee P. Wells.  Rimco's reason for existence was to sell properties to MCA.

12.    MCA operated the investment Pools through wholly-owned and intertwined subsidiaries.  In 1995, MCA entered into a contractual relationship with Sterling Bank and Trust under which Sterling Bank and Trust was to act as trustee.

13.    Much of the real estate collateral underlying the Pool Pass-Through Certificates had only a fraction of the fair market value for which it was promoted and sold.  Some pieces of real estate collateral were vacant lots.  Other pieces of property with a fair market value of approximately $10,000 were encumbered with three or more mortgages issued by MCA totaling approximately $60,000.

14.    Mortgages and land contracts secured to the properties were sold back and forth between limited partnerships owned by MCA officers (a/k/a "related companies") at inflated prices and without discharging the previous mortgages.  Money generated from the sale of the multiple mortgages was used to pay returns to investors who had purchased interests in earlier Pools.  Some of the investors' money was never used to buy property for Pools as intended.  Sterling had a duty to insure that the investors' money was used for its intended purpose and that none of the pools' financial integrity was damages or impaired.

15.    The offering documents for the Pool Pass-Through Certificates that were sold to Plaintiffs represented that Plaintiffs would realize profits on the investment by receiving a proportionate share of the repayment of principal along with interest from payments made by the land contract vendees and obligors under the mortgages.  In fact, Plaintiffs were not repaid from the said proceeds, but rather from funds MCA

obtained by issuing new mortgages.  The investment program thus became, in effect, a Ponzi Scheme.  The scheme collapsed in January 1999 and the Michigan Financial Institutions Bureau was appointed a conservator.

16.     That the officers and directors of MCA, through the use of several broker/dealers sold the pool pass-through certificates to several thousand retirees throughout southeast Michigan.  MCA, as noted, is in bankruptcy and the pool pass-through certificates are now worthless as a result of the misfeasance of the Defendant officers and directors and Defendant Sterling Bank.

17.     That beginning in 1990, MCA was the sponsor, issuer and seller of investments covered by the Michigan Uniform Securities Act, MCL 451.101 et seq. and the Securities Act of 1933, 15 U.S.C. 77(a) et seq.

18.     That the information supplied to Plaintiffs in the offering documents was false and misleading and contained material omissions of fact for which some Plaintiffs may be entitled to rescission and others to damages pursuant to the Securities Act of 1933 and the Michigan Uniform Securities Act, and MCL 451.810.

19.     That Plaintiffs purchased the following pools:

| | |
|---|---|
| Ronnie Hagel invested | Pool 79, 48 |
| Judy and Robert Wilson | Pool 129 |
| Felipe S. Lozano Jr. and Joy A. Lozano | Pool 131 |
| Kenneth Hunter | Pools 127, 91, 60, 48, 42 |
| Dorothy Hunter | Pool 132 |
| James and Patricia Moody | Pool 126, 121 |
| Dr. John Natsis | Pool 91, 69, 45, 30 |
| Donna Borovich | Pool 71 |

That based on Plaintiffs' information and belief, only pools 121 and higher are within this applicable statute of limitation of §13 of the Securities Act of 1933.

20.    That this class consists of all individuals who purchased pool pass-through certificates issued by MCA during the class period who have sustained financial damages through the negligence of the officers and directors and the breach of fiduciary duties by Sterling.  There are approximately 2,000 individual investors.

### COUNT I – VIOLATION OF SECURITIES LAWS

21.    That Defendants, STERLING BANK AND TRUST, FSB, ALEXANDER J. AJEMIAN, PATRICK D. QUINLAN, LEE P. WELLS, KEITH D. PIETIELA, JAMES B. QUINLAN, D. MICHEAL JEHLE, RONALD B. DARGA, JOHN P. O'LEARY, DENNIS AGRESTA, ARLENE A. DOYLE, DANIEL J. O'CONNOR, CHERYL SWAIN, and C. THOMAS WELLS, JR., were officers and directors of MCA Financial Corporation (MCA) who had direct supervisory control over the operations of that corporation and of subsidiary corporations which sold securities to Plaintiffs in violation of the Securities Act of 1933 and the Michigan Uniform Securities Act, MCLA 451.810.

22.    That as officers and directors directly involved with the various operations of MCA, Defendants should have known and prevented misstatements and omissions of fact provided Plaintiffs by MCA for the investments Plaintiffs made with MCA.

23.    That Defendants violated both the Securities Act of 1933 and MCA 451.810 by failing to seek out and correct the misinformation being provided by MCA.

24.    That each Defendant's failure is a proximate cause of injury and damage to Plaintiffs.

25.    That this Court has jurisdiction by both the federal and state statute to adjudicate this matter pursuant to the Securities Act of 1933, 15 U.S.C. 77(a) et seq.

7

and the Michigan Uniform Securities Act, MCLA 451.810. (15 U.S.C. §77v(a) gives the Plaintiff the option of bringing an action such as this either in state or federal court).

26.     That Plaintiffs' claims are based on Defendants' role as officers and directors and as control persons and sound in negligence rather than fraud.

WHEREFORE, Plaintiffs pray that this Court enter a judgment against Defendants in an amount in excess of twenty-five thousand ($25,000.00) dollars to which Plaintiffs are entitled, plus interest, costs and attorney fees.

### COUNT II – VIOLATION OF FIDUCIARY DUTIES

27.     That Sterling Bank in September, 1995 entered into an agreement with MCA to act as a trustee for the benefit of Plaintiffs.

28.     That Defendant Sterling Bank held a fiduciary duty to said Plaintiffs arising out of its relationship as trustee for the benefit of Plaintiffs' investments.

29.     That Defendant Sterling Bank was negligent in its duty of care to Plaintiffs and said negligence was a proximate cause of damages to Plaintiffs.

30.     That said violation of duty included, but is not limited to the following:

a.     That Defendant failed to monitor the MCA activities so that property serving as collateral for Plaintiffs' investments was not encumbered negligently or fraudulently by the MCA companies;

b.     That money paid by investors to purchase real estate pools was used for that purpose;

c.     That Defendant negligently assigned duties owed Plaintiffs back to the MCA companies whereby failing in its fiduciary duty to protect Plaintiffs' interest in the investments;

.8

    d.    That Defendants entered into a position of trust while having a conflict of interest with Plaintiffs' interest.

31.    That Defendants are liable to Plaintiffs pursuant to the common laws of Michigan for violating its position of trust.

WHEREFORE, Plaintiffs pray that this Court enter a judgment against Defendants in an amount in excess of twenty-five thousand ($25,000.00) dollars to which Plaintiffs are entitled, plus interest, costs and attorney fees.

LAW OFFICES OF JEROME G. QUINN, P.C.

JEROME G. QUINN (P19156)
Attorney for Plaintiffs
74 West Long Lake Rd., Suite 203
Bloomfield Hills, Michigan 48304
(248) 642-0023

Dated:  August 23, 2000

## JURY DEMAND

NOW COMES Plaintiff, through counsel undersigned, and hereby demands trial by jury in the above-referenced cause of action.

LAW OFFICES OF JEROME G. QUINN, P.C.

JEROME G. QUINN (P19156)
Attorney for Plaintiffs
74 West Long Lake Rd., Suite 203
Bloomfield Hills, Michigan 48304
(248) 642-0023

Dated:  August 23, 2000

11

**STATE OF MICHIGAN**
**CIRCUIT COURT FOR THE COUNTY OF WAYNE**

RONNIE HAGEL, JUDY AND
ROBERT WILSON, FELIPE LOZANO JR.
KENNETH HUNTER, JAMES AND
PATRICIA MOODY, DR. JOHN NATSIS
DOROTHY HUNTER and DONNA BOROVICH,
Individually and on Behalf of All Persons
Similarly Situated,

       Plaintiffs,

       vs.

STERLING BANK AND TRUST, FSB;
ALEXANDER J. AJEMIAN;
PATRICK D. QUINLAN; LEE P. WELLS;
C. THOMAS WELLS, JR., KEITH D. PIETIELA;
JAMES B. QUINLAN; D. MICHAEL JEHLE;
RONALD B. DARGA; JOHN P. O'LEARY;
DENNIS AGRESTA; ARLENE A. DOYLE;
DANIEL J. O'CONNOR; and CHERYL SWAIN,
Jointly and Severally,

       Defendants.

| | |
|---|---|
| Jerome G. Quinn (P19156) | Larry G. Mason (P17183) |
| Attorneys for Plaintiffs | Co-Counsel for Plaintiffs |
| 74 W. Long Lake Rd. | Larry G. Mason, P.C. |
| Suite 203 | 1530 Rochester Rd. |
| Bloomfield Hills, MI 48304 | Royal Oak, MI 48067 |
| (248) 642-0023 | (248) 547-5310 |

---

**MOTION FOR CERTIFICATION OF ACTION AS A CLASS**
**ACTION AND BRIEF IN SUPPORT OF MOTION FOR**
**CERTIFICATION OF ACTION AS A CLASS ACTION**

Plaintiffs RONNIE HAGLE, JUDY WILSON, ROBERT WILSON, FELIPE

LOZANO, JR., KENNETH HUNTER, DOROTHY HUNTER, JAMES MOODY,

PATRICIA MOODY, DONNA BOROVICH and DR. JOHN NATSIS, on behalf of

themselves and the Class of 2,000 others similarly situated, through their attorneys,

LAW OFFICES OF JEROME G. QUINN, P.C. and LAW OFFICES OF LARRY G. MASON, P.C., respectfully requests that this Court enter an Order certifying this action as a class action on behalf of all persons who purchased Real Estate Pass-Through Certificates Securities from MCA Corporation during the time period of January 1, 1990 through February 28, 1999. All Plaintiffs have suffered economic damages as a result of the wrongful conduct of the Defendants as set forth in the Complaint which is incorporated herein by reference. All Defendants, through acts of omission or commission, participated in the activities which resulted in economic damage to the Plaintiffs.

1.     For the purposes of determining whether Class Certification will be granted, the Court should take the substantive allegations of the Complaint as true.(Blackie Barrack, 524 F2nd 891, 901 n 16(CA 9 1975); (Newberg On Class Actions 3rd Edition Chapter 7.02)

2.     Any doubts that the Court has regarding the propriety of Certification should be resoled in favor of allowing the Class Action so that it will remain an effective tool for deterring wrongdoing. (In Re Data Corp Securities Litigation, 116 FRD 216(d) MINN (1986).

3.     Pursuant to Eisen v Carlisle Jacquelin, 417 US 156, 177-78 (1974), inquiry into the merits of the case is forbidden when ruling on a motion for a class certification.

4.     Rule 3.501 of the Michigan Rules of Court govern Class Actions. Rule 3.501 is patterned upon Rule 23 of the F.R.C.P. governing Class Actions in Federal Courts. The Michigan Courts look to Federal Court decisions under Rule 23 for

guidance when interpreting Rule 3.502. Hence, Plaintiffs' reference to Federal Authority

5.      Plaintiffs have filed a Two Count Complaint against the officers and directors of the now bankrupt Mortgage Corporation of America Financial Corp. (MCA) and its various entities charging them with acts of negligence and misfeasance resulting in economic damages. Plaintiffs have also sued Sterling Bank & Trust, FSB, (Sterling) which entered a trusteeship agreement for the Plaintiffs' benefit with MCA in 1995.

## CASE SYNOPSIS

6.      The investors in the Pool Pass-Through Certificates are mostly retirees who purchased the Pool Pass-Through Certificates as a source of retirement income. The Pool Pass-Through Certificates allegedly consisted of a percentage share in Pools of real-estate-related holdings consisting of land contracts and mortgages purportedly secured to properties and based on no more than 90% of said properties' fair market value. In fact, most of the properties were occupied by renters, not purchasers with ownership or equitable interest and were encumbered with mortgages several hundred times in excess of their fair market value. (See paragraph twelve below). The properties were not capable of producing enough income to pay taxes, insurance, maintenance and management costs let alone service the mortgage and land contract debt. MCA Financial Corporation (MCA) designed and directed the investment scheme and Sigma Financial Corporation (Sigma) and other broker/dealers acted as underwriters and sellers. Patrick D. Quinlan, James P. Quinlan, Lee P. Wells and C. Thomas Wells, Jr. collectively own sixty-seven percent (67%) of the outstanding stock

3

of MCA and are control persons of MCA and its wholly-owned subsidiaries.

7.    MCA purchased the properties for the Pools from Rimco Financial Corporation (Rimco), which is the parent corporation of several other companies related to the scheme.  Rimco is owned equally by Patrick D. Quinlan, Lee G. Rogers and Lee P. Wells.  Rimco's reason for existence was to sell properties to MCA.

8.    MCA operated the investment Pools through wholly-owned and intertwined subsidiaries.  MCA also established contractual relationships with Sterling Bank and Trust, FSB (Sterling) for the benefit of the Plaintiffs.  Under the contract, Sterling was to act as trustee over the investment pools to protect the purchasers' interests.  The contract was modified and expanded in 1997.  Under both contracts, Sterling delegated its duties as a trustee back to MCA, the very corporation it was supposed to be monitoring through its trusteeship.  The Master Pool Servicing Agreements specifically name MCA as Defendant Sterling's agent.

9.    While Defendant Sterling was exercising its trusteeship through its agent, MCA, MCA did engage in acts of misfeasance involving pool investment proceeds and pool properties in breach of said trust.  The acts of MCA are, legally, the acts of Sterling.

10.    Much of the real estate collateral underlying the Pool Pass-Through Certificates had only a fraction of the fair market value as claimed by Defendants. Some pieces of real estate collateral were vacant lots.  Other pieces of property with a fair market value of approximately $10,000 were encumbered with three or more mortgages issued by MCA totaling approximately $60,000.  The deeds for the properties were filed with the Wayne County Register of Deeds office, and, had Sterling

4

exercised its trusteeship obligations in a competent manner and in accordance with its fiduciary duty, it would have discovered the acts of misfeasance set forth herein.

11.     Mortgages and land contracts secured to the pool properties were sold at inflated prices back and forth between the various limited partnerships owned by the MCA officers. The properties were sold back and forth between the related parties without discharging previous mortgages. Had Defendant Sterling been properly exercising its fiduciary duties as a trustee, it would have reviewed the Wayne County track index and realized there were multiple pledges on pieces of property and that all of the pools were being severely effected through misfeasance at MCA.

12.     The offering documents for the Pool Pass-Through Certificates that were sold to Plaintiffs represented that Plaintiffs would realize profits on the investment by receiving a proportionate share of the repayment of principal along with interest from payments made by the land contract vendees and obligors under the mortgages. In fact, Plaintiffs were not repaid from said proceeds, but rather from funds MCA obtained by issuing new mortgages back and forth between the related limited partnerships owned by its officers and directors. The investment program thus became, in effect, a Ponzi Scheme. The scheme collapsed in January, 1999 and the Michigan Financial Institutions Bureau appointed a conservator.   ·

13.     Defendants sold the Pool Pass-Through Certificates as non-registered securities. Defendants attempted to characterize the sale of the securities as qualifying as exempt transactions under the Michigan Uniform Securities Act. However, the sales of the securities did not qualify as exempt transactions under MCL 451.802(b), Sec. 402(b) and the Securities Act of 1933. The substance of the scheme reflects that the

5

numerous sales of Pool Pass-Through Certificates were not isolated transactions, but rather part of one continuous promotion under which the same collateral was repeatedly used for each new Pool offering. For example, to qualify as an offering exempt from registration under Michigan Uniform Securities Act and the Securities Act of 1933, there cannot be more than two (2) offerings per year of the same security. MCA and Defendants were selling an average of thirteen (13) offerings per year from 1990 through January, 1999. The officers and directors were negligent for permitting such an operation to go on.

14. That the purchasers of the pool pass-through certificates have together lost approximately sixty million dollars.

15. The wrongdoing of the Defendants noted above is identical as to each of the class Plaintiffs. More simply put, as to each Plaintiff each of the Defendant's acts are identical.

## MAINTAINABILITY OF CLASS ACTION

16. The maintainability of a class action is governed by Michigan Rules of Court 1985, Rule 3.501(A). Plaintiffs assert that this case meets all of the requirements of Rule 3.501(A) which requires:

(A) **Nature of Class Action**

1) One or more members of the class may sue or be sued as representative parties on behalf of all members of a class action only if:

a) The class is so numerous that joinder of all members is impractical;

b) There are questions of law and fact common to the members of the class that predominate over questions only effecting individual members;

6

c) The claims or defenses of the representative parties are typical of the claims or defenses of the class;

d) The representative parties will fairly and adequately assert and protect the interest of the classes; and

e) The maintenance of the action as a class action will be superior to other available methods of adjudication in promoting the convenient administration of justice.

17.   This lawsuit meets the requirements of Rule 3.501(A)(1) as follows:

(a) **Numerosity.**   There are approximately 2,000 Plaintiffs and joinder of all members of the class in one lawsuit is impracticable.

(b) **Common Questions of Law or Fact.**   There are both common questions of law and fact present.   Some of the common questions of law include the duties of the MCA officers and directors under the Michigan Uniform Securities Act and the Securities Act of 1933 to avoid acts of misfeasance in the execution of their duties.   The common questions regarding said duties is whether the Defendants met their obligations under the law.   There are common questions of law as to the duties of Sterling as a trustee and whether it failed to met its duties are common questions of fact.

(c) **The claims and defenses of the representative parties are typical of the claims or defenses of the class.**   All of the representative parties claim to have lost money in their pool pass-through investments as a result of the negligence and misfeasance of the MCA officers and directors named as Defendants herein as well as through the failure of Sterling to exercise its fiduciary duties.

(d) **The representative parties willfully and adequately assert and protect the interest of the class.**   Virtually all of the representative parties are retirees or individuals who have lost a substantial portion of their retirement savings through the investment.   Failure to recover their losses will have a serious impact upon their retirement income and standard of living.   Therefore, they are highly motivated to pursue this lawsuit to a successful conclusion.

7

> **(e) Maintenance of this lawsuit as a class action is certainly superior to other available methods of adjudication in promoting the convenient administration of justice.** One lawsuit that can solve issues effecting approximately 2,000 individuals is certainly preferable to the court system handling 2,000 separate claims.

20.    That the class meets the manageability requirements of Rule 3.501(A)(2)(c). The action will be manageable inasmuch as it will focus on the sale of the pool pass-through certificates by MCA and the management and oversight of these activities by the Defendant officers and directors and the trustee, Sterling.

21.    It is preferable to pursue this case as a class action under Rule 305(a)(2)(d) because of the costs involved to the Plaintiffs and Defendants in the pursuit and defense of separate actions.

22.    That pursuant to MCR 3.501(C)(3)(4) and (5), Plaintiffs propose that notice be provided to the class by direct mail. The individual officers and directors of MCA all have lists of the individual investors or have access to such lists. Therefore, notification of a class membership by mail should be the most efficient.

23.    That this Motion is filed in compliance with Rule 3.501(B)(1)(a). For the above reasons, Plaintiff respectfully requests that this Honorable Court certify the above action as a class action.

LAW OFFICES OF JEROME G. QUINN, P.C.

Jerome G. Quinn (P19156)
Attorney for Plaintiffs
74 W. Long Lake Rd., #203
Bloomfield Hills, MI  48304
(248) 642-0023

Dated:  August 24, 2000

**STATE OF MICHIGAN**
**CIRCUIT COURT FOR THE COUNTY OF WAYNE**

RONNIE HAGEL, JUDY AND
ROBERT WILSON, FELIPE LOZANO JR.
KENNETH HUNTER, JAMES AND                     Case No: 00-
PATRICIA MOODY, DR. JOHN NATSIS               Hon:
DOROTHY HUNTER and DONNA BOROVICH,
Individually and on Behalf of All Persons
Similarly Situated,

       Plaintiffs,

       vs.

STERLING BANK AND TRUST, FSB;
ALEXANDER J. AJEMIAN;
PATRICK D. QUINLAN; LEE P. WELLS;
C. THOMAS WELLS, JR., KEITH D. PIETIELA;
JAMES B. QUINLAN; D. MICHAEL JEHLE;
RONALD B. DARGA; JOHN P. O'LEARY;
DENNIS AGRESTA; ARLENE A. DOYLE;
DANIEL J. O'CONNOR; and CHERYL SWAIN,
Jointly and Severally,

       Defendants.

_____/

| | |
|---|---|
| Jerome G. Quinn (P19156) | Larry G. Mason (P17183) |
| Attorneys for Plaintiffs | Co-Counsel for Plaintiffs |
| 74 W. Long Lake Rd. | Larry G. Mason, P.C. |
| Suite 203 | 1530 Rochester Rd. |
| Bloomfield Hills, MI  48304 | Royal Oak, MI  48067 |
| (248) 642-0023 | (248) 547-5310 |

_____/

**BRIEF IN SUPPORT OF MOTION FOR**
**CERTIFICATION OF ACTION AS A CLASS ACTION**

    This case involves the sale to investors of interests in Pools of income-generating real estate.  The investment product is referred to in the offering documents used by Defendants as "Real Estate Pass-Through Certificates."  In other portions of the relevant materials issued by Defendants the investment product is referred to as

"Real Estate Interests" and "Pools."  The pool pass-through certificates are securities and therefore the conduct of persons involved in their sale is subject to the requirements of the Michigan Uniform Securities Act, the Securities Act of 1933, as well as the common law duties of a fiduciary.  **Substantial portions of the factual allegations set forth in this Complaint are based upon a report filed by Timothy G. Skillman, an employee of BBK, Ltd, which is the Court appointed conservator in bankruptcy for Mortgage Corporation of America (MCA).  The report was filed in the bankruptcy division of the US District Court for the Eastern District of Michigan, Southern Division for case number 99-42172 et al.  (See Exhibit A** attached).  A copy of the Complaint is attached to the Court's copy only.  The Complaint is identified as Exhibit B.  Plaintiffs' counsels have also interviewed Thomas Cronin, who was Chairman, President and CEO of MCA Mortgage Corporation until he resigned in December of 1996.

The investors in the pool pass-through certificates are mostly retirees. The pool pass-through certificates allegedly consisted of a percentage share in pools of real estate-related holdings consisting of land contracts and mortgages purportedly secured to properties and based on no more than 90% of said properties' fair market value.  In fact, most of the properties were occupied by renters, not purchasers with ownership or equitable interest and were encumbered with mortgages several hundred times in excess of their fair market value. MCA Financial Corporation (MCA) designed and directed the investment scheme.  Patrick D. Quinlan, James P. Quinlan, Lee P. Wells and C. Thomas Wells, Jr. collectively own sixty-seven percent (67%) of the outstanding stock of MCA and are control persons of MCA and its wholly-owned subsidiaries.

MCA purchased the properties for the Pools from Rimco Financial Corporation (Rimco), which is the parent corporation of several other companies related to the scheme.  Rimco is owned equally by Patrick D. Quinlan, Lee G. Rogers and Lee P. Wells.  Rimco's reason for existence was to sell properties to MCA.

MCA operated the investment Pools through wholly-owned and intertwined subsidiaries.  MCA, through its officers and directors, also established a contractual relationship with Sterling Bank and Trust, FSB (Sterling).

Sterling entered into a Master Pool Servicing Agreement with MCA in 1995.  It was expanded in 1997.  (See Master Pool Servicing Agreement attached hereto as Exhibit C).  Under the Agreement, Sterling named MCA as its agent for the execution of Sterling's trusteeship responsibilities.  Sterling's agent, MCA, committed acts of gross misfeasance which effected the interest of all the pool holders.  Further, Sterling violated its trusteeship duties by releasing investors' funds under conditions which violated the trust agreement.

Much of the real estate collateral underlying the pool pass-through certificates had only a fraction of the fair market value for which it was promoted and sold.  Some pieces of real estate collateral were vacant lots.  Other pieces of property with a fair market value of approximately $10,000 were encumbered with three or more mortgages issued by MCA totaling approximately $60,000.  Property taxes were delinquent on most properties.

Mortgages and land contracts secured to the properties were sold back and forth between the various limited partnerships owned by the MCA officers and directors at inflated prices and without discharging the previous mortgages.  Money generated from

3

the sale of the multiple mortgages was used to make payments to earlier property pools. Some of the investors' money was never used to buy property for the pools as intended but used, instead, to fund day-to-day operations of MCA and for the payment of large bonuses to MCA officers and directors. Defendant Sterling was responsible for overseeing the use of these funds and for insuring that the proper pools were purchased. Also, Defendant Sterling was responsible for seeing that preexisting pools were not encumbered by misuse of money which it had a duty to oversee.

The offering documents for the pool pass-through certificates that were sold to Plaintiffs represented that Plaintiffs would realize profits on the investment by receiving a proportionate share of the repayment of principal along with interests made by the land contract vendees and obligors under the mortgages. The documents were part of a uniform sales format followed by the sellers of the investment. In fact, Plaintiffs were not repaid from the income generated by the pool properties, but rather from funds MCA obtained by issuing new mortgages. The investment program thus became, in effect, a Ponzi Scheme. Had Defendant Sterling been performing its duty as a trustee, this would not have occurred. Further, inasmuch as the agents of Sterling were conducting a Ponzi Scheme, it is responsible for their acts. The scheme collapsed in January, 1999 and the Michigan Financial Institutions Bureau moved for appointment of a conservator. MCA is now in Chapter 11 bankruptcy.

Defendants sold the pool pass-through certificates as non-registered securities. Defendants attempted to characterize the sale of the securities as qualifying as exempt transactions under the Michigan Uniform Securities Act and the Securities Act of 1933. However, the sales of the securities did not qualify as exempt transactions under

4

Michigan or Federal Securities laws, and hence, were illegal. The substance of the scheme of the numerous sales of pool pass-through certificates were not isolated transactions, but rather part of one continuous promotion under which the same collateral was repeatedly used for each new pool offering or multiply pledged to pay earlier investors. Defendants offered a single class of securities to all class members. Further, Defendants solicited more than thirty-five (35) people per offering and sold to people who did not meet the income and net worth levels required under the Michigan Uniform Securities Act and the Securities Act of 1933. Under Michigan law regulating the sale of unregistered offerings, the sellers cannot solicit more than thirty-five (35) offerees. Also, the law requires that the offerees meet a minimum income requirement of at least one hundred thousand ($100,000.00) dollars per year and have a net worth of at least one million ($1,000,000.00) dollars. Failure to meet those standards destroys the exempt status and renders the sale illegal. It is unquestioned that the Defendants in MCA solicited more than thirty-five (35) offerees per pool. The Defendant officers and directors were negligent in failing to discover and stop the illegal activity which resulted in the collapse of the MCA Corporation and the loss of Plaintiffs' investments.

The wrongdoing of Defendants, both mentioned and unmentioned, in the facts above is identical as to each of the class Plaintiffs. More simply put, as to each Plaintiff each Defendant's acts are identical.

5

## LEGAL ARGUMENT

I. **RULE 3.501(A)(1) IS SATISFIED**

In the case at bar, Plaintiffs seek a declaration that Defendants' conduct with respect to the class as a whole make certification under Michigan Court Rule 3.501, appropriate.  That rule provides:

> A) **Nature of Class Action**
>
> 1) One or more members of the class may sue or be sued as . representative parties on behalf of all members of a class action only if:
>
> a) The class is so numerous that joinder of all members is impractical;
>
> b) There are questions of law and fact common to the members of the class that predominate over questions only effecting individual members;
>
> c) The claims or defenses of the representative parties are typical of the claims or defenses of the class;
>
> d) The representative parties will fairly and adequately assert and protect the interest of the classes; and
>
> e) The maintenance of the action as a class action will be superior to other available methods of adjudication in promoting the convenient administration of justice.

Michigan trial courts look to the corresponding Federal Rule (Rule 23) for guidance in application of this Rule.  See McCalla v Ellis, 180 Mich. App. 372, 377-387; 446 N.W. 2d. 904 (1989); Brenner v Marathon Oil Company, 565, N.W. 2d. 1 (Mich. App. 1997); Mooahest v Dept of the Treasury, 492 N.W. 2d. 246 (Mich. App. 1992).

Federal Rule of Civil Procedure 23(a) requires that in order for a class action to proceed, it must be shown that:

1.    The class is so numerous that the joinder of all members is impracticable;

6

2.    ·There are questions of law and fact common to the class;

3.    The claims or defenses of the representative parties are typical of the claims or defenses;

4.    The representative parties will fairly and adequately protect the interest of the class.

Rule 23(b) authorizes certification if the four prerequisites of Rule 23(a) are met, and

> The court find that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Eisen v Carlisle Jacquelin, 417 U.S. 156; 94 S. Ct. 2140 (1974).

In determining whether a class action will be allowed, the substantive allegations of the complaint should be taken as true, except where clearly controverted by evidence. Blackie v Barrack, 524 F. 2d. 891, 901 n 16 (CA9 1975). In addition the court should resolve any doubt regarding the propriety of certification "in favor of allowing the class action," so that it will remain an effective tool for deterring wrongdoing. In Re: Data Corp. Securities Litigation, 116 F.R.D. 216 (D Minn. 1986).

> Without the class action device, many actionable wrongs will go uncorrected and persons affected thereby unrecompensed. In essence, the class action device is a bona fide method for addressing violation of the . . . laws and for compelling compliance with their mandates. Accordingly, the interest of justice require that in a doubtful case . . . any error, if there is to be one, should be committed in allowing the class action.

Inquiry into the merits of the case is forbidden in ruling on a motion for class certification. Eisen v Carlisle Jacquelin, 417, U.S. 156, 177-178 (1974). Furthermore, whether the Plaintiff has properly alleged the cause of action for the purposes of this

motion is irrelevant. <u>Milberg</u>, 68, F.D.R. 49 (E.D. N.Y. 1975).  Thus, for the purposes of this Motion, the Court must accept the substantive allegations in Plaintiff's Complaint as true.

As the following will demonstrate each of the prerequisite of Rule 23 are satisfied in this case, beyond any doubt.

## A.   NUMEROSITY

The numerosity prerequisite is satisfied in situations where "problems of management and administration would be extremely cumbersome and difficult by joinder of all absentee members" <u>Grettenberger Pharmacy Inc</u>. v <u>Blue-Cross Blue Shield of Michigan</u>, 98 Mich App 1; 296 NW2d 589 (1980); <u>Grigg</u> v <u>Michigan Nat'l Bank</u>, 405 Mich 148; 274 NW2d 752 (1979); <u>Pressly</u> v. <u>Lucas</u> 30 Mich App 300; 186 NW2d 40 (1971).  In determining numerosity, the Court may look to the type of action, the size of the individual claims, the inconvenience of connecting individual lawsuits, and other factors pertaining to the propriety of joining all proposed class members.

In this case, there are about two thousand (2,000) class members.  In order for a Class to be certified, however, it is not necessary to know the precise number class members.  "[O]nly that the numbers of protected Plaintiffs are so large as to make it impracticable to bring each case individually." <u>Grettenberger Pharmacy Inc</u>., v <u>Blue-Cross Blue Shield</u>, <u>supra</u>; <u>Citizens For Pretrial Justice</u> v. <u>Goldfarb</u>, 99 Mich App 519; 278 NW2d 656 (1979).  In the case now before this Court, the numerosity requirement is amply satisfied.

**B.    COMMON QUESTIONS**

**Defendants officers and directors duties to Plaintiffs are common to the class as a whole.** Plaintiffs have pled that Defendant officers and directors breached their duties under the Securities Act of 1933 as well as MCLA 451.810. The directors are required to perform the duties of their offices in a competent and non-negligent manner. Their duties to all of the Plaintiffs are the same under these laws.

**The duties of Sterling Bank as pled in the Complaint are common to all Plaintiffs in the class.** Sterling assumed a duty under a contract of trusteeship with MCA for the benefit of the Plaintiffs in this class. There are no significant individual questions of law or fact that would warrant denial of class certification as the law cited below reflects.

Rule 23 requires that Plaintiff show that "there are questions of law or fact common to the Class." Common questions of law or fact exist where a Defendant or Defendants have allegedly engaged in a course of action that adversely affects a group of individuals and said actions give rise to a claim for relief. Rodigquez v Berrybrook Farms, Inc., 672 F Supp 1099 (WD Mich 1987). Commonality does not require that every question of law or fact be common to every member of the Class but rather the requirements are met where questions affecting the Class members are substantially related to the resolution of the litigation even though the individuals are not identically situated. Dix v American Bankers Life Assurance Co of Florida, 429 Mich 410; 415 NW2d 206 (1987); Freeman v StateWide Carpet Distributors Inc., 365 Mich 313; 112 NW2d 439 (1962). "The critical question is whether the individual issues will overwhelm and render the Class Action form valueless." Milberg v Lawrence Cederhurst Fed S&L

Ass'n, 68 FRD 49, 52 (ED NY 1975); Goebel v First Federal Savings and Loan Ass'n, 266 NW2d 352 (WIS 1978).

Thus, the commonality requirement is satisfied where the Plaintiff challenges the validity of rules that are common to the Class. Hedge v Lyng, 689 F Supp 884, 889-90 (D MINN 1987); See, e.g., Esplin v Hirschi, 402 F2d 94, 98-100 (CA 10 1978). (Class certification proper were a thrust of case concerned "omissions of material facts common to all Class members"); In re American Continental Corp/Lincoln Savings Securities Litigation, 140 FRD 425, 430 (D Ariz 1992) (Oral representations " uniformly patterned on a known model provides certitude that material misrepresentations were a causative factor in each Plaintiff's decision. Thus, a Class Action may be maintained where  Plaintiff can establish that the sales agents' representations did not vary in material respects").    Such rules may   address institution procedure and practice. Plainly, when a party has engaged in conduct that affects and/or threatens a group of persons and gives  rise to a cause of action, one or more of the elements of that a cause of action will be common to all persons affected.   In re Control Data Corp Securities Litigation, 116 FRD 216 (D Minn 1986).  Mere differences regarding the amount of monetary recovery to which particular Class members may be entitled do not defeat the propriety of Class Certification of settlement Class. Robertson, 389 F Supp at 898 n 57; White, 822 F Supp at 1404 ("Under the proposed settlement members of the Class will receive settlement payments based on certain factors, but this difference will not bar a class status"); American Finance System Inc., v Harlow, 404 F Supp 806 (E MINN 1975) (The commonality requirement is satisfied if the common question of liability are present regardless of individual variations and damages).

The commonality requirement of Rule 3.501 is met here.  All questions bearing on the Defendants' liability to each class member is common, including, but not limited to the followings:

1.      Did Defendants Alexander Ajemian, Patrick D. Quinlan, Lee P. Wells, Keith D. Pietiela, James B. Quinlan, D. Michael Jehle, Ronald B. Darga, John P. O'Leary, Dennis Agresta, Arlene A. Doyle, Daniel J. O'Connor and Cheryl Swain (the MCA entity officers and directors), C. Thomas Wells, Jr. and Lee G. Rogers (the Rimco officers and directors) act in a negligent manner in executing the duties they owed to their respective corporations and investors therein, including the class Plaintiffs as alleged in the Complaint?  Also, if the Defendants were negligent, did their negligence cause economic damage to the Plaintiffs?

2.      Did Sterling breach its duty as a trustee by attempting to delegate its duties to MCA as its agent for overseeing the pool investments?  Furthermore, did Sterling know or should it have known, through its agent MCA Properties, that the securities held by Plaintiffs were not sound or were being unsoundly managed and that the pool investment program was on the verge of becoming worthless?  If so, did Defendant Sterling's breach of duties cause economic damage to Plaintiffs?

There are no significant, let alone predominant individual legal issues that obscure the common issues in this action.  **The Defendant officers and directors were either negligent or not.  Defendant Sterling either breached its fiduciary duty as a trustee or it did not.**  See, Esplin v Hirschi, 402 F. 2d. 1994, 98-100 (CA 10 1968) Class certification proper where the Thrust of the case concerned "certain omissions of material facts to all class members, cert den'd, 394 U.S. 928 (1969).  In determining

11

whether common questions of law or fact exist for purposes of Rule 23, courts follow a well-established procedure of identifying issues of law or fact germane to the establishment of the Plaintiffs' class (as alleged) and then determining whether these issues can be resolved on a common basis. See e.g., Bogosin v Golf Oil Corp., 561 F. 2d. 434, 455055 (CA 3 1977) cert den'd, 434 U.S. 10.86 (1978). If the Defendant officers and directors had been paying attention to their duties under the law, the investment program would not have been administered as it was. Further, had the officers and directors uncovered such a program and executed their duty to inform the investors or potential investors, the economically suicidal activities of MCA would have been brought to a halt much sooner. Further, many individuals who invested in the later years of the program would not have done so had the officers and directors uncovered the misfeasance when they should have.

In the case at hand, the Defendants' actions or inactions raise issues of fact and law common to the named Plaintiffs and all those similarly situated. Given the presence of so many indisputable common questions as indicated above, MCR Rule 3.501's requirement for the existence of common questions of fact or law is met here.

### C.    TYPICALITY

MCR 3.501 via Rule 23 requires that "claims or defenses of the representative parties . . . be typical of the claims or defenses of the class." As with the test for commonality, the test for typicality "is not demanding" Forbush v J.C. Penny Corporation, Inc., 994 F. 2d. 1101, 1106 (CA 5 1993); Deboer, 64 F. 3d. 1174-75.

When the same unlawful conduct affects the named Plaintiffs and the class the typicality requirement is usually met irrespective of the varying fact patterns which

underlie individual claims. <u>Deboer</u>, 64 F3d 1174-75 ("Typicality is not altered by the different mortgages held by class members"); <u>Zinverg</u> v <u>Washington Bank Corp</u>, 138 FRD 397, 408 (D NJ 1990) (Crucial question on typicality is whether named Plaintiff in class can "point to the broad course of alleged fraudulent conduct: to support a claim for relief); <u>In re Worker's Compensation</u>, 130 FRD at 105, 130 FRD at 105; <u>Tate</u> v <u>Weyerhauser Corporation</u>, 723 F2d 598, 608 (CA 8 1983). Thus, the requirement is satisfied when "the claims of the named Plaintiff emanate from the same legal theory as the claims of the class members". <u>In re Worker's Compensation</u>, 130 FRD at 105; <u>Dirks</u>, 105 FRD at 132-133; <u>Paxton</u>, 688 F2d 561-62; <u>Donaldson</u> v <u>Pillsbury Corporation.</u>, 554 P2d 825, 831 (See A 8) ("When the claim arises out of the same legal or remedial theory, the presence of factual variations is not normally sufficient to preclude class action treatment") <u>cert den'd</u> 434 US 856; 98 S Ct 177; 54 L Ed 2d 128 (1977); <u>Lindquist</u> v <u>Bower</u> , 663 F Supp 846 (WD Mo 1986) <u>Affirmed</u> 813 F2d 884 CA 8 (1987); <u>Leff</u>, <u>supra</u> at 9; <u>Deboer</u> 64 F3d 1174-75.   The typicality requirement maybe satisfied even if there are factual distinctions between claims of the named representative and between other class members. <u>De La Fuente</u> v <u>Stokley Van Kamp Inc.</u>, 713, F2d 225, 232 (See A 7 1983); <u>Jordan</u> v <u>County of Los Angeles</u>, 669 F2d 1311, 1321 (CA 9 1982); See <u>Leff</u>, <u>supra</u> at 8 (Named Plaintiffs allegation that Defendant retained a surplus in his escrow account, as well as in the account of other persons who signed standard mortgage forms was sufficient to establish typicality).[1]

---

[1] It is only when a unique defense will consume the merits of the case that a class should not be certified. The mere fact that one or more plaintiffs in the proposed class may have been subject to a to a unique equitable defense is not an impediment to the class certification. <u>Leff</u>, <u>Supra</u> at 9-10; <u>Milberg</u>, 68 FDR 49 (ED NY 1975).

The named representatives' theory of liability and type of relief must be the same as those of the class members. Id. See, Robidoux v Celani, 987 F2nd 931, 936037 (CA 2 1993) (Typically met despite varying fact patterns).  Therefore, when it is alleged that the same or similar unlawful conduct was directed at or affect both the named Plaintiff and the class sought to be represented, the typicality requirement is met irrespective of varying fact patterns which underlie individual claims.  Donaldson v. Pillsbury, 554 F2d 825, 830 (CA 8) cert den'd, 434 US 856; 98 S Ct 177 (1977); Dirks v Clayton Brokerage Co, 105 FRD 125, 133 (D Minn 1985).  The fact that damages remedies have to be individually tailored does not serve as a bar to certification.  Coley v Clinton, 635 F2d 1364 (CA 8 1980).

For example, In re Baldwin-United Corp Lit, 122 FRD (SD NY 1986), a class of investors asserted federal securities, RICO and state law claims against a broker-dealer of a promotional corporation in  a fraud action, was certified where the Plaintiff class relied on proof of a consistent course of alleged conduct that existed beyond the instances of fraud unique to them.

Any defenses to the merits of the claim will be identical whether asserted against Plaintiffs or the proposed class members.   Each class member is attacking the practices of the Defendants under common legal theories.  Plainly, any one of them could be a class representative and would have no interest unique to themselves or to any other class member.  In short, this is, in every respect, a model case for class action treatment by this court.

D.   ADEQUACY

Rule 23 requires that "the representative parties will fairly and adequately protect the interests of the class."  This requirement has two elements: (1) that the class representatives and their counsel will competently and vigorously prosecute and action; and  (2) that the interests of the class representatives are not adverse to those of the class members.  Grigg v Michigan Nat'l Bank, supra; Citizens for Pre-Trial Justice, supra; Hays v Regents of University of Michigan, 53 Mich App 605; 220 NW2d 91 (1974).  The adequacy requirement is similar to the typicality requirement in that the "fact that some representatives face additional defenses does not defeat their ability to adequately represent the class."  In re Wirebound Boxes, 128 FDR at 271.  Rule 23(a) does not require identically of the strength and size of each member's claims.

In the present case, it is clear that both requirements have been fully satisfied and any of the class members would adequately represent all of the others.  There are entirely common questions, and no antagonistic interests whatsoever.

When reaching a determination concerning vigorous prosecution of an action on behalf of the class, courts consider the competence and experience of class counsel.  A significant factor to be considered is class counsel's prior experience with class actions and the substantive law involved.  Gigg v Michigan Nat'l Bank, Supra.  Class counsel has been trial lawyers for 29 years and demonstrated that they possess the experience and competence to provide adequate representation to all class members in litigation of this sort.

15

II.    **MCR 3.501(A)(2) IS SATISFIED**

In addition to the above analysis, under MCR 3.501(A)(2), the court must also consider the following factors:

> (a)    Whether the prosecution of separate actions by or against individual members of the class would create a risk of inconsistent or various adjudications, or adjudications with respect to individual members of the class that would, as a practical matter, be dispositive of the interests of other class members;
>
> (b)    Whether final equitable or declaratory relief might be appropriate with respect to the class;
>
> (c)    Whether the action will be manageable as a class action;
>
> (d)    Whether in view of the complexity of the issues or the expense of litigation, the separate claims of individual class members are insufficient in amount to support separate actions;
>
> (e)    Whether it is probable that the amount which may be recovered by individual class members will be large enough in relation to the expense and effort of administering the action to justify a class action; and
>
> (f)    Whether members of the class have a significant interest in controlling the prosecution or defense of separate actions.

Taking the last factor first, the members of this class, including their named representatives, have a significant interest in maintaining this action as a class action. As a class is defined above, to prosecute a separate action on behalf of each individual would be inefficient and the amount of recovery to be expected would not justify the bringing of such separate actions. On the other hand, the class is so large, and the recovery potentially so great, that it justifies the expense and effort of administering the action as a class action.

16

Furthermore, common issues are presented by this lawsuit. It is hard to imagine that a more efficacious means of resolving this issue exists besides the prosecution of an action on behalf of the class. Prosecuting this action as a class action would allow this court to issue the relief which would be appropriate with respect to the entire class, including possible equitable or declaratory relief which could stop this unjust practice.

Finally, for the same reason, the prosecution of separate actions would create a risk of inconsistent or varying adjudications. Adjudications with respect to certain members of the class might, as a practical matter, be dispositive of the interest of the other class members. This class action will be manageable as a class action, for the reasons set forth previously in Section 1 infra.

Respectfully Submitted,

LAW OFFICES OF JEROME G. QUINN, P.C.

By: Jerome G. Quinn (P19156)
Attorneys for Plaintiffs
74 W. Long Lake Rd., #203
Bloomfield Hills, MI 48304
(248) 642-0023

Dated: August 24, 2000

17



EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:

| | |
|---|---|
| MCA FINANCIAL CORP., | Case No. 99-42172 |
| MCA MORTGAGE CORPORATION, | Case No. 99-42181 |
| MORTGAGE CORPORATION OF AMERICA, INC., | Case No. 99-42183 |
| RIMCO FINANCIAL CORP., | Case No. 99-42184 |
| RIMCO MANAGEMENT COMPANY, | Case No. 99-42185 |
| RIMCO BUILDING COMPANY, | Case No. 99-42186 |
| RIMCO DEVELOPMENT COMPANY, | Case No. 99-42187 |
| REAL ESTATE SOLUTIONS GROUP, | Case No. 99-42188 |
| RIMCO REALTY AND MORTGAGE, | Case No. 99-42189 |
| MORTGAGE CORPORATION OF AMERICA, | Case No. 99-42190 |
| WAREHOUSE LENDERS, INC., and | Case No. 99-42191 |
| PROPERTY CORPORATION OF AMERICA, | Case No. 99-42192 |

Chapter 11

Debtors.                                              Hon. Steven W. Rhodes
Jointly Administered

_____/

## DECLARATION OF TIMOTHY G. SKILLMAN IN SUPPORT OF OBJECTIONS TO THE U.S. TRUSTEE'S MOTION TO DISMISS

Timothy G. Skillman, being duly sworn, submits the following declaration in support of the objections filed by Debtors to the U.S. Trustee's motion to dismiss, as directed by the Court at the hearing on April 5, 1999:

1.     I make this declaration of my own knowledge and I am competent to testify to the facts stated in this declaration.

2.     I am a principal of BBK, Ltd.

3.      I became involved with Debtors on or about January 28, 1999, when Commissioner Patrick M. McQueen of the Michigan Financial Institutions Bureau appointed B. N. Bahadur, a principal of BBK, Ltd. as Conservator. The Conservator retained BBK, Ltd. at that time and later appointed me as the Chief Operating Officer of Debtors.

4.      Since that date, I have been involved in the day to day operations of Debtors, and the Conservator's efforts to stabilize Debtors' businesses and to determine the various claims of parties in interest to assets of the estates. I have also supervised the investigation of the interrelationships among Debtors.

5.      Debtors were organized according to the organization chart attached as Exhibit A. This chart was created prepetition by prior management. MCA Financial Corp. is the parent corporation of MCA Mortgage Corporation, Mortgage Corporation of America (which is the parent of Mortgage Corporation of America, Inc.) and RIMCO Realty and Mortgage. Although not shown on the chart, Warehouse Lenders, Inc. is a wholly owned subsidiary of MCA Financial Corp. MCA Financial Corp. and its subsidiaries are identified as the "MCA entities". MCA Financial Corp. has many shareholders, but was controlled by the Quinlan and Wells families (owning approximate 67% of the unrestricted common shares).

6.      RIMCO Financial Corp. is the parent corporation of RIMCO Management Company, RIMCO Building Company, RIMCO Development Company and Real Estate Solutions Group. See

Exhibit A. RIMCO Financial Corp. and its subsidiaries are identified as the "RIMCO entities".
RIMCO Financial Corp. was owned equally by Patrick Quinlan, Lee Rogers and Lee Wells.

7.      The twelfth Debtor, Property Corporation of America, an affiliated company, is
owned 50% by Patrick D. Quinlan and 50% by Lee P. Wells. It is the general partner for the
following limited partnerships: Lincoln Park Limited Partnership; MRP 101 Limited Partnership;
MRP 102 Limited Partnership; MRP 103 Limited Partnership; MRP 104 Limited Partnership; MRP
105 Limited Partnership; MRP 106 Limited Partnership; MRP 107 Limited Partnership; MRP 108
Limited Partnership; MRP 109 Limited Partnership; Eastside Limited Partnership; and Retail Realty
Limited Partnership. It is also the managing member of the following limited liability companies:
One-Ten, LLC; One-Twelve, LLC; One-Thirteen, LLC; One-Fourteen, LLC; One-Fifteen, LLC;
One-Sixteen, LLC; One-Seventeen, LLC; One-Eighteen, LLC; One-Nineteen, LLC; and One-
Twenty, LLC. See Exhibit A.

8.      My investigation of Debtors' history disclosed that the RIMCO entities became
involved (by way of common ownership) with the MCA entities in the early 1990s. Prior to the
affiliation, the MCA entities engaged in the purchasing, selling and managing of properties, as well
as the traditional mortgage business (originating, buying, selling and servicing of mortgages). An
ostensibly "separate" entity was sought because certain of the MCA entities' lenders, Fannie Mae
and certain government agencies had requirements that, or indicated a desire for, the rehabilitation
operations to be conducted by a "separate" company. Nonetheless, despite the separate corporate
names and accounting systems and slightly different ownership, the MCA entities and RIMCO

entities were under common control and basically run as one enterprise. As discussed in more detail below, a benefit to having ostensibly separate entities was that Debtors were able to sell properties to affiliated companies with separate accounting systems, even though no funds changed hands for the sales (or if funds did change hands, those funds were loaned by one Debtor to another). This allowed the MCA entities to recognize considerable gains on sales of real property even though the sales were to a related property which purchased the property with funds borrowed from the MCA entities.

9. ·    Historically, Debtors regularly transferred large amounts of funds among themselves as intercompany transfers. For example, the MCA entities paid various expenses directly for the RIMCO entities (e.g., personal property leases, insurance and some payroll items) and "charged" the RIMCO entities for such items by making book entries. In addition, on a weekly basis, the MCA entities transferred to the RIMCO entities approximately $65,000 for use by the RIMCO entities for rehabilitation of rental properties. Also, the MCA entities transferred to the RIMCO entities as much as $500,000 monthly for general operating expenses and for rehabilitation of properties held for resale. Again, these transfers were entered as book entries. Attached as Exhibit B is a list of intercompany transfers among Debtors for the fiscal year ending January 31, 1999, showing the numerous transfers of funds totaling millions of dollars among the MCA entities and the RIMCO entities. For the fiscal year ending January 31, 1999, the amount advanced to the RIMCO entities from the MCA entities, net of credits, totaled $9,746,000.

10.    In addition to the transfers described in paragraph 9, Exhibit B shows various collection activity by the RIMCO entities on behalf of the MCA entities and Property Corporation of America's limited partnerships and limited liability companies with respect to the rental and/or sale of real properties. The RIMCO entities participated in the MCA entities' servicing business by collecting land contract payments and providing mortgage and land contract servicing support to the MCA entities by handling delinquent and "REO" accounts through its collection staff and its in-house legal staff. See Exhibit B, general ledger between Mortgage Corporation of America and RIMCO Building Company which shows credits of over $300,000 in 1998 to RIMCO for such servicing support.  The RIMCO entities also collect rents which are the primary source, although not sufficient, of cash flow to service the MCA entities' mortgages on the properties.

Providing this financing came at a great cost to the MCA entities.  Because the RIMCO entities' rental and rehabilitation properties did not generate sufficient cash flow to cover operating costs and debt service on the mortgages, the MCA entities were forced to fund the carrying cost of these non-performing assets.  This carrying cost included the interest cost on in excess of $100 million on bank warehouse loans, as well as the pass-through principal and interest required on approximately $40 million of syndicated pools.  Conservatively estimated, this carrying cost was, no doubt, in excess of $10 million a year.

Although the RIMCO entities were clearly totally dependent upon the MCA entities for their life support, paradoxically, as the situation at the MCA entities deteriorated in the fall of 1998, the MCA entities became increasingly reliant upon the RIMCO entities.  The RIMCO entities' operations, although a money-losing prospect in the longer-term, had the ability to generate cash in the short-term.  This cash generation was the result of the MCA entities' practice of placing

mortgages on the properties that were well in excess of the acquisition cost (as described in more detail below). Ultimately, this excess cash was to be spent on rehabilitation costs, however, in the short-run, this excess was used as a source of the MCA entities' cash flow. Attached as Exhibit C, is internal correspondence dated October 8-9, 1998 among members of management of Debtors discussing that interdependence, and an agenda dated January 20, 1998 [sic-apparently should be 1999]. The notes on the agenda, apparently made by Mr. Rogers, contain the most blunt description of the RIMCO/MCA interrelationship: "The only reason RIMCO exists [is] to buy property for MCA so they could mark it up and borrow against it." Ex. C.[2]

11.    In 1996 and 1998, certain of Debtors (identified below), as borrowers, entered into loan agreements with the Board of Trustees of the Policemen and Firemen Retirement System of the City of Detroit ("Pension Fund"). A copy of the Loan and Financing Agreement dated July 18, 1998 with related documents, is attached as Exhibit D. A copy of the Second Loan and Financing Agreement dated March 6, 1998 with related documents, is attached as Exhibit E.

(a)    The "Borrowers" under the Loan and Financing Agreement (Exhibit D) were MCA Financial Corp., MCA Mortgage Corporation, Mortgage Corporation of America, Mortgage Corporation of America, Inc., MCA Realty Corporation, Complete Financial Corp. and Securities Corporation of America. Those Borrowers represented to the Pension Fund:

---

[2] These notes replaced a more vulgar description of the relationship.

"The Borrowers represent, warrant, acknowledge, agree and confirm that they have collective and mutual intertwined, interdependent, and common interests and business transactions between and/or among the Borrowers, including, but not by way of limitation, financial interests, the Financial Statement Interests evidenced by the Financial Statements, interests in various assets and properties, and the uses thereof, and interests in operations (including in the financing, purchase, and origination of mortgage loans and servicing rights with respect to mortgage loans, and other related activities), such common interest being further evidenced by the Financial Statements of the Borrowers (collectively hereinafter referred to as the "Common Interests"); and

"The Borrowers represent, warrant, acknowledge, agree and confirm that the Borrowers are under Common Control (as defined in the Credit Agreement); and

"The Borrowers represent, warrant, acknowledge, agree and confirm that the nature of said Common Interests and Common Control benefits all the Borrowers collectively; and

"The Borrowers represent, warrant, acknowledge, agree and confirm that they will be collectively and/or singularly deriving, directly and/or indirectly, substantial benefits from the Loan (as hereinafter defined) and the transactions hereinafter contemplated, and the disbursements and uses of the proceeds of the Loan, directly and/or indirectly, by any one or more of the Borrowers irrespective of the disbursement to, or use of the proceeds by, any of the particular Borrowers * * *." Exhibit D., pp 1-2.

The Second Loan and Financing Agreement has a similar provision (Exhibit E, p. 14).

(b)    The Loan and Financing Agreement contains a prohibition against Debtors RIMCO Financial Corp. (the parent company of the RIMCO entities) and its subsidiaries from having consolidated net income in excess of $50,000 in any fiscal year and provide that "all such excess shall be for the benefit of Borrowers; received by Borrowers and reflected in the Financial Statements of Borrowers." Exhibit D, p. 19. This particular covenant is made by the Borrowers (the MCA entities), and the RIMCO entities executed the Loan Agreement

to consent to this provision and others relating to the RIMCO entities. The Second Loan and Financing Agreement has similar provisions. Exhibit E, p. 18.

(c)    Both agreements contain provisions authorizing the Pension Fund as lender to inspect the books and records of Borrowers and the RIMCO entities, and require that the RIMCO entities deliver financial statements to the Pension Board. See Ex. D, p. 20, Ex. E., p. 21.

(d)    In connection with the Second Loan and Financing Agreement, the Pension Fund received the legal opinion of Butzel Long for all signatories (the MCA entities and RIMCO Financial Corp.) to the loan agreement. See Ex. E.

(e)    The structure of the Pension Fund loans, especially the prohibition of the RIMCO entities having annual consolidated net income in excess of a nominal amount, demonstrates that the RIMCO entities operated as mere instrumentalities of the MCA entities and that together they constituted one enterprise.

12.    The fact that Debtors operated as one enterprise may best be demonstrated by the program used by Debtors to purchase and encumber real property and then to obtain funds by pledging or selling the related party land contract vendor interest and/or pledging the related party mortgages placed on those properties.

13.    Attached as Exhibit F is a chart showing an example of the program created by Debtors. One of the MCA entities would purchase real properties at a relatively low price for cash or on land contract. Sometimes the properties were encumbered by liens for taxes, mortgages or underlying land contract. The MCA entities would then (sometimes on the same day) convey the property on land contract to a Property Corporation of America limited partnership or limited liability company (see Ex. A). On information and belief, the land contract sales to affiliates were at a substantial mark-up to the original purchase price and did not reflect fair market value. Subsequent mortgages were of the vendee's interest but were based on the transfer price without reduction for the balance due to the land contract vendor. The mortgage(s) would then be pledged to a lender or lenders under a warehouse lending arrangement and the MCA entities would receive the cash for the inflated sale to its affiliate.

14.    A significant portion of the real property interests of Debtors are also hopelessly intertwined and conflicting. Debtors, the Bank Group and Paine Webber have initiated title searches of over one thousand real properties owned by Debtors or Property Corporation of America limited partnerships and limited liability companies. The intertwining and conflicting interests are demonstrated by the following examples:

(a)    On November 3, 1995, Mortgage Corporation of America acquired 12 properties from William G. Toll for $95,000 (the deed does not allocate the purchase price but on average the price was less than $8,000 per property). One of those properties was 12890 Penrod, Detroit, Michigan. Also on November 3, 1995, Mortgage Corporation

of America sold 12890 Penrod on land contract to MRP-108 Limited Partnership. On January 16, 1998, MRP-108 Limited Partnership mortgaged the 12890 Penrod to Mortgage Corporation of America for $21,600. On May 15, 1998, MRP-108 Limited Partnership quit-claimed the property to One-Fifteen LLC. Also of record is a May 30, 1998 memorandum of land contract between Mortgage Corporation of America and One-Fifteen LLC. On July 8, 1998, One-Fifteen LLC mortgaged 12890 Penrod to Mortgage Corporation of America for $21,600. On October 28, 1998, One-Fifteen LLC mortgaged 12890 Penrod to Mortgage Corporation of America for $21,600. All three mortgages were of record as of the date of the title search. See Exhibit G, summary page of title search completed by Land America Information Company on March 19, 1999.

(b)     Mortgage Corporation of American acquired 7639-47 Brace, Detroit, Michigan from Gary Lynn Nichol and Sandra Ellyn Nichol on July 31, 1995, for $8,500. On July 31, 1995, Mortgage Corporation of America sold 7639-47 Brace on land contract to MRP-108 Ltd. Partnership. By quitclaim deed dated July 31, 1995, MRP-108 Limited Partnership quit-claimed 7639-47 Brace to Eastside Limited Partnership (however, this quit claim deed was not recorded until October 31, 1998). On January 16, 1998, MRP-108 Limited Partnership mortgaged 7639-47 Brace to Mortgage Corporation of America for $18,900. On April 7, 1998, MRP-107 [not MRP-108] Limited Partnership mortgaged 7639-47 Brace to Mortgage Corporation of America for $22,950. On June 29, 1998, MRP-108 Limited Partnership mortgaged 7639-47 Brace to Mortgage Corporation of America for $18,900 (however, this mortgage was not recorded until November 13, 1998, after the

August 5 and September 16, 1998 mortgages identified below).  On August 5, 1998, MRP-108 Limited Partnership mortgaged 7639-47 Brace to Mortgage Corporation of America for $18,900. On September 16, 1998, MRP-108 Limited Partnership mortgaged 7639-47 Brace to Mortgage Corporation of American for $22,950. All five mortgages were of record as of the date of the title search. See Exhibit H, summary page of title search completed by Datatrace Information Services Company, Inc. on March 19, 1999.

     (c)     Mortgage Corporation of America acquired 4879 Ashland, Detroit, Michigan on October 31, 1995 from David J. Siwak and Annette Siwak for $7,500. Also on October 31, 1995, Mortgage Corporation of America sold 4879 Ashland on land contract to MRP-108 Ltd. Partnership. On June 19, 1996, Mortgage Corporation of America quit-claimed 4879 Ashland to Sterling Bank and Trust, acting as trustee under the Master Pooling & Servicing Agreement dated September 1, 1995, for the benefit of the Series 1996-106 Pool. On March 28, 1997, MRP-108 Limited Partnership mortgaged the property to Mortgage Corporation of America for $19,800. On July 23, 1997, MRP-108 Limited Partnership mortgaged 4879 Ashland to Mortgage Corporation of America for $19,800. On January 16, 1998, MRP-108 Limited Partnership mortgaged 4879 Ashland to Mortgage Corporation of America for $19,800. On June 29, 1998, MRP-108 Limited Partnership mortgaged 4879 Ashland to Mortgage Corporation of American for $19,890. On August 5, 1998, MRP-108 Limited Partnership mortgaged 4879 Ashland to Mortgage Corporation of American for $19,890. All five mortgages were of record as of the date of the title search.

See Exhibit I, summary page of title search completed by Datatrace Information Services Company, Inc. on March 16, 1999.

    (d)    Mortgage Corporation of American acquired 9195 Schaefer, Detroit, Michigan from Aruba Enterprises, Ltd. on July 31, 1996, for $10,500. Also on July 31, 1996, Mortgage Corporation of America sold 9195 Schaefer on land contract to MRP-108 Ltd. Partnership for $24,000. On October 22, 1996, Mortgage Corporation of America quit-claimed 9195 Schaefer to Sterling Bank and Trust acting as trustee under the Master Pooling & Servicing Agreement dated September 1, 1995, for the benefit of the Series 1996-112 Pool. On January 16, 1998, MRP-108 Limited Partnership mortgaged 9195 Schaefer to Mortgage Corporation of America for $21,600. On June 29, 1998, MRP-108 Limited Partnership mortgaged 9195 Schaefer to Mortgage Corporation of America for $21,600. On August 5, 1998, MRP-108 Limited Partnership mortgaged 9195 Schaefer to Mortgage Corporation of American for $21,600. All three mortgages were of record as of the date of the title search. The MCA entities then borrowed $21,168 from Chase Texas, N.A. on the warehouse line based on one mortgage and borrowed $21,168 from Paine Webber based on another mortgage. See Exhibit J, summary page of title search completed by Land America Information Company on March 16, 1999.

15.    The RIMCO entities existed to sell properties to third parties if possible, to rehabilitate the properties, and to service the properties. Thus, the RIMCO entities would collect rents and pay for maintenance repairs, taxes and insurance. The RIMCO entities would also be

required to pay the underlying land contract and other liens (e.g., taxes) on the properties. Often the RIMCO entities were unable to do so because they did not collect enough money to pay for rent collection, taxes and insurance, maintenance of the properties and debt service. Indeed, as discussed above, it was necessary that the MCA entities fund the RIMCO entities' operations on an ongoing basis.

One such blurring of legal entities is the RIMCO entities' practice of preparing RIMCO Financial, Inc. financial statements inclusive of the assets, liabilities, revenues and expenses of RIMCO Realty and Mortgage, Inc., a wholly owned subsidiary of MCA Financial Corp. This practice serves to underscore the lack of distinction that management drew between the corporate entities and the practical difficulty in severing the entities.

16.    The RIMCO entities also provided servicing by participating in the servicing of mortgage loans and land contracts by taking legal action against renters, mortgagors and/or land contract vendees who were in default.

17.    Based on BBK, Ltd.'s preliminary investigation, I currently estimate that the parties in interest in these cases will experience total losses of at least $100 million. I believe that a significant portion of that amount, will be losses for investors in the pools.

TIMOTHY G. SKILLMAN

STATE OF MICHIGAN      )
                       ) ss.
COUNTY OF WAYNE        )

The foregoing was acknowledged before me this 19th day of April, 1999, by TIMOTHY G. SKILLMAN.

_Sandra J. Ottino_

Notary Public
_MACOMB_, Michigan
My Commission Expires: _11-21-2000_

SANDRA J OTTINO
Notary Public, State of Michigan
Macomb County, Michigan
Acting in Wayne County, Michigan
My Commission Expires November 21, 2000

C

## AMENDED AND RESTATED MASTER
## POOLING AND SERVICING AGREEMENT

This is an AMENDED AND RESTATED MASTER POOLING AND SERVICING AGREEMENT (the "Agreement"), made and entered into as of November 1, 1997, by and among MORTGAGE CORPORATION OF AMERICA, a Michigan corporation ("MCA"), MCA PROPERTIES, INC. ("MCA Properties") and STERLING BANK AND TRUST, FSB, a federal savings bank (the "Trustee"), as trustee for the benefit of the subscribers (the "Investors") who purchase undivided interests in the Pools of Real Estate Interests described hereafter. This Agreement amends and restates the Master Pooling and Servicing Agreement between MCA and the Trustee, dated as of September 1, 1995.

MCA intends to acquire Real Estate Interests and convey such interests to MCA Properties, as nominee agent for the Trustee in designated pools ("Pools") and to offer and sell undivided fractional interests ("Units") in each such Pool. Such undivided fractional interests in each Pool will be evidenced by Unit Certificates, and will be offered and sold by MCA through registered broker-dealers that are members of the National Association of Securities Dealers, Inc., in transactions which are exempt from the registration requirements of the federal Securities Act of 1933, as amended, and applicable state securities laws.

In consideration of the mutual promises contained herein and other good and valuable consideration, the parties hereto agree as follows:

I.      Definitions.

"Agreement" means this Agreement, together with any amendments or modifications and any supplements hereto.

"Confidential Memorandum Supplement" means the supplement to the Confidential Memorandum used in connection with the offer and sale of undivided interests in a Pool that are evidenced by the Unit Certificates, which supplement will be prepared with respect to each Pool hereafter created by MCA.

"Cut-off Date" means the date specified in a Confidential Memorandum Supplement as the date established by MCA, at its sole discretion, to determine the amount of Net Receivables to be purchased by a particular Pool.

"Determination Date" means the 20th day of July, October, January and April of each year, beginning with such of those dates as is designated in the Confidential Memorandum Supplement for a particular Pool.

"Distribution Date" means the 28th day of July, October, January and April of each year beginning with such of those dates as is designated in the Confidential Memorandum Supplement for a particular Pool.

"Net Receivable" means for each Real Estate Interest the total of the Receivable, adjusted for accrued interest due on the Receivable, and in the case of a Wraparound-type Investment, less the sum of any related Senior Lien Payables, adjusted for accrued interest due on each of them.

"Nominee Agent" means an agent listed in the chain of title for real property that is acting on behalf of the Trustee.

"Obligor" means the individual or entity obligated to make payments on the instrument evidencing a Real Estate Interest.

"Pool Account" means the account described in Section 7 of this Agreement.

"Receivable" means the face amount or principal balance due from the obligor on a Real Estate Interest, which in the case of a Wraparound-type investment includes any amount due on any related Senior Lien Payables.

EXHIBIT
2

"Real Estate Interest" means a real estate-related investment which is included in a particular Pool, which may include a land contract, mortgage note, deed of trust, trust deed, hypothecation or partial assignment of any such instrument, including participation interests therein, and which may in any such case be a Wraparound-type Investment.

"Record Date" means the last day of the month next preceding the month in which a Distribution Date falls.

"Repurchase Price" means (i) the amount of Net Receivables in a Pool at the time of repurchase, as adjusted below, plus any accrued interest, multiplied by (ii) the undivided percentage interest in such Pool held by a Unitholder. The adjustment to Net Receivables noted above is invoked to the extent that the five-year U. S. Treasury Note interest rate (the "Treasury Rate") in effect on the repurchase date differs from the Treasury Rate in effect on the Cut-Off Date. In the event the Treasury Rate on the repurchase date exceeds the Treasury Rate in effect on the Cut-Off Date, the amount of that difference is added to the anticipated yield-to-expected-life of the discounted Net Receivables existing as of the Cut-Off Date, as designated on the Confidential Memorandum Supplement for such Pool. The resulting aggregate discount rate is employed to discount the amount of Net Receivables existing as of the repurchase date. The discount method assumes a Pool life equal to 70% of the number of days remaining after the repurchase date in the Real Estate Interests' contractual lives.

"Senior Lien Payable" means the face amount or principal balance due on an obligation to which a Real Estate Interest is subject, and which has a claim against the real property superior to the Real Estate Interest.

"Unit Certificate" means a certificate evidencing ownership of a Unit in the form of Annex I hereto.

"Unitholder" means any person, including MCA, shown on the Unit Register to be maintained by the Trustee pursuant to Section 4 as the owner of an undivided interest in a Pool and in whose name Units have been issued.

"Wraparound-type Investment" means an Real Estate Interest where the face amount receivable and periodic payments due from the obligor includes amounts owing to one or more underlying or superior lienholders.

2.   Representations and Warranties of MCA and MCA Properties.

(a)   MCA hereby represents and warrants to the Investors and the Trustee as follows:

(i)   Prior to the time they are purchased on behalf of each Pool, MCA will be the owner of the Real Estate Interests free and clear of all liens and encumbrances other than Senior Liens;

(ii)   MCA has full power and authority to sell, assign, transfer, set over and convey to the Investors an undivided interest in each Pool and to enter into this Agreement;

(iii)   The real property underlying each Real Estate Interest to be included in each Pool will be property on which is situated an occupied residential structure containing 1 to 4 dwelling units or will be commercial or other types of real estate which has undergone a Phase I environmental audit conducted by a reputable firm.

(iv)   MCA will hold no adverse interest by way of security or otherwise (except for a junior lien or a purchase money mortgage) in any Real Estate Interest pertaining to or to be made part of any Pool.

(v)   Prior to the time each Real Estate Interest is acquired on behalf of a Pool, MCA will have in its possession, and will provide to the Trustee, for each Real Estate Interest copies of (A) the documents evidencing and securing each Real Estate Interest; (B) an appraisal, or certificate of valuation or inspection; (C) appropriate closing settlement statements, loan policies and/or certificates of attorney's opinion or title insurance payable in an amount at least equal to the outstanding principal balance of each Real Estate Interest; and (D) insurance policies in an amount representing coverage at least equal to the outstanding Receivable, or

the full insurance value of the improvements, whichever is less, and of a type at least as protective as fire and extended coverage containing a mortgagee clause;

(vi)    (A) There will be no defaults under any of the Real Estate Interests to be conveyed to each Pool, except as described in the Confidential Memorandum Supplement pertaining to such Pool, nor will there be any fact in existence which alone or with the passage of time or the giving of notice, or both, would constitute a default thereunder; and (B) there will be no delinquent tax or assessment liens or mechanics liens on the properties securing the Real Estate Interests to be conveyed to each Pool and such properties are free from substantial damage and are in good repair; and

(vii)    To the best of MCA's knowledge, the obligations of the obligor on each Real Estate Interest to make payment under the terms of the documentation evidencing and securing the Real Estate Interest as and when due are not subject to any defense, set-off or counterclaim by any person obligated to pay any indebtedness or perform any obligation pursuant to the Real Estate Interest.

(b)    MCA Properties represents and warrants to the Trustee as follows:

(i)    It is duly organized and existing as a corporation under the laws of the State of Michigan and has all requisite corporate power and authority to perform its duties and obligations hereunder and to carry on its business as presently conducted.

(ii)    It has all requisite corporate power and authority to enter into this Agreement, and this Agreement has been duly executed and delivered by it and is a valid and binding obligation of it, enforceable in accordance with its terms except as such enforceability may be limited by bankruptcy, insolvency, moratorium, and other similar laws affecting creditors' rights generally, and general principles of equity regardless of whether asserted in a proceeding in equity or at law.  Neither the execution and delivery by MCA Properties of this Agreement nor the performance by it of such duties and obligations will conflict with or result in a breach of any provision of its Articles of Incorporation or Bylaws or any of the terms, conditions or provisions of any note, bond, mortgage, indenture, franchise, license, permit, lease agreement or other instrument or obligation to which it is a party.

3.    Creation of Trust; Appointment of Trustee and Nominee Agent.  This Agreement constitutes a trust agreement between MCA and the Trustee and evidences the appointment by MCA of the Trustee to act as trustee for the benefit of the Unitholders with respect to each Pool.  Further, by executing this Agreement the Trustee hereby appoints MCA Properties as its nominee agent and reaffirms that the Unitholders' interests in the Real Estate Interests represented by a particular Pool, and the interests of any successor Unitholders, will be held of record by MCA Properties, as the nominee agent for the Trustee, in a fiduciary capacity for the benefit of all Unitholders of that particular Pool.  MCA Properties hereby accepts such appointment and agrees to perform all of its duties and obligations hereunder.  Physical possession of all documents relating to Real Estate Interests shall remain with the Trustee.  Record title to the Real Estate Interests transferred to a particular Pool shall be held in the name of "MCA Properties, Inc., nominee for the Trustee U/A/D as of November 1, 1997, for the beneficial owners of the Series J99-_-_ Pool".  MCA shall undertake to execute and record any documents necessary to evidence the record ownership of MCA Properties in the Real Estate Interests.  No third party shall be required to investigate the propriety of any acts undertaken by MCA in its capacity as servicing agent, or to investigate the propriety of any acts undertaken by the Trustee in its capacity as trustee for the benefit of the Unitholders.  Such third parties shall be entitled to rely upon recorded certifications by MCA or the Trustee of its status as servicing agent or trustee, as the case may be, unless and until modifications or revocations of such certifications are recorded.  The Trustee shall have no responsibility for the performance by MCA of its obligations hereunder as servicing agent for each Pool, or for any other acts or omissions by MCA or MCA Mortgage.  MCA agrees to indemnify the Trustee and hold it harmless from and against any claim, loss, damage or liability asserted against the Trustee which is based upon the acts or omissions of MCA or MCA Mortgage.

3

4.      Unit Certificates. (a) The Unit Certificates for each Pool shall be substantially in the form of Annex I hereto and shall, on original issue, be executed and delivered by the Trustee to MCA, for further delivery to the Investors within 180 days after payment of the required purchase price. Unit Certificates shall be initially issued and may be re-issued upon transfer or exchange. All Unit Certificates shall be executed on behalf of the Trustee by a duly authorized officer, and the Trustee shall keep or cause to be kept a Unit Certificate register in which, subject to such reasonable regulations as it may prescribe, it shall provide for the registration of Unit Certificates and of transfers and exchanges of Certificates as herein provided.

(b)      No transfer of a Unit Certificate or Unit Certificates may be made unless such transfer is made pursuant to an effective registration statement under the Securities Act of 1933, as amended, or is exempt from the registration requirements under said Act. In the event that a transfer is to be made in reliance upon an exemption from said Act, in order to assure compliance with said Act, any prospective transferee and any subsequent transferee shall provide to the Trustee and the Unitholder desiring to effect such transfer, if requested by MCA, an opinion of counsel acceptable to MCA to the effect that the transfer is made in compliance with said Act. MCA is not obligated to register the Unit Certificates under said Act or any other securities law. Subject to the preceding paragraph, upon surrender for registration of transfer of any Unit Certificate at its office, the Trustee shall execute in the name of the designated transferee or transferees, one or more new Unit Certificates of a like aggregate participation interest and dated the date of execution by the Trustee. At the option of the Unitholders, Unit Certificates may be exchanged for other Unit Certificates of authorized denominations of a like aggregate participation interest, upon surrender of the Unit Certificates to be exchanged at such office. Whenever any Unit Certificates are so surrendered for exchange, the Trustee shall execute the Unit Certificates which the Unitholder making the exchange is entitled to receive. Every Unit Certificate presented or surrendered for transfer or exchange shall be duly endorsed by, or be accompanied by a written instrument of transfer in form satisfactory to the Trustee duly executed by the Holder thereof or his attorney duly authorized in writing. No service charge shall be made for any transfer or exchange of Unit Certificates, but the Trustee may require payment of a sum sufficient to cover any tax or governmental charge that may be imposed in connection with any transfer or exchange of Unit Certificates. All Unit Certificates surrendered for transfer and exchange shall be canceled by the Trustee.

(c)      Prior to due presentation of a Unit Certificate for registration of transfer, the Trustee may treat the person in whose name any Unit Certificate is registered as the owner of such Unit Certificate and the participation interest in the Pool evidenced thereby for the purpose of receiving remittances and for all other purposes whatsoever, and neither MCA nor the Trustee shall be affected by notice to the contrary.

5.      Administration and Servicing of Real Estate Interests. MCA shall service and administer the Real Estate Interests held by each Pool and shall have full power and authority, acting alone, to do any and all things in connection with such servicing and administration which it deems necessary or desirable; provided that MCA shall act in a manner consistent with the terms of this Agreement. MCA may waive, modify or vary any term of any Real Estate Interest or consent to the postponement of strict compliance with any such term or in any manner grant indulgence to any Obligor if in MCA's prudent determination such waiver, modification, postponement or indulgence is in the best interests of the Unitholders. Without limiting the generality of the foregoing, MCA Properties, at the request of MCA, shall execute and deliver on behalf of itself, the Trustee and each Unitholder all instruments of satisfaction or cancellation, or of partial or full release, discharge and all other comparable instruments, with respect to the Real Estate Interests held by each Pool, and MCA shall fully indemnify the Trustee against any claims or damages asserted against or incurred by the Trustee as a result of such actions by MCA Properties in response to a request by MCA. If required by MCA, each Unitholder, the Trustee and MCA Properties shall furnish MCA with any powers of attorney and other documents necessary or appropriate to enable MCA to carry out its servicing and administrative duties under this Agreement.

MCA, in servicing and administering the Real Estate Interests, shall employ procedures (including collection procedures) and exercise the same care that it customarily employs and exercises in servicing and administering land contracts and mortgage interests for its own account giving due consideration to accepted servicing practices of prudent

4

lending institutions and the Unitholders' reliance on MCA. The reports resulting from all independent audits of the Pools and/or of MCA will be submitted to the Trustee.

Notwithstanding any other provision of this Agreement to the contrary, neither MCA nor any other person shall have the power or authority to reinvest, trade or substitute Real Estate Interests or other assets in which the Investors have an equitable or legal interest. This limitation of authority shall not however be construed as prohibiting (i) the replacement of Real Estate Interests prior to the formation of the Pool itself, (ii) the purchase by MCA of all outstanding Unit Certificates in accordance with Section 15, (iii) the placement of cash earned on the Real Estate Interests in an interest-bearing bank account pending its distribution each quarter, and (iv) the exercise of rights and remedies against a defaulting obligor and against the real estate securing the defaulted obligation, so long as such exercise does not involve activities inconsistent with Section 301.7701-4(c) of the Regulations promulgated by the U.S. Department of Treasury, or any successor law or regulation.

6.    Liquidation of Real Estate Interests.  In the event that any payment due under any Real Estate Interest and not postponed is not paid when the same becomes due and payable, or in the event the obligor fails to perform any other covenant or obligation under the Real Estate Interest and such failure continues beyond any applicable grace period, MCA shall take such action consistent with Section 5 as it shall deem to be in the best interest of Unitholders. In the event that any payment due under any Real Estate Interest and not postponed remains delinquent for a period of 90 days or more, MCA shall, in connection with such foreclosure or other conversion, follow such practices and procedures consistent with Section 5 as it shall deem necessary or advisable and as shall be normal and usual in its general real estate servicing activities. The foregoing is subject to the proviso that MCA shall not be required to expend its own funds in connection with any foreclosure or forfeiture or towards the restoration of any property unless it shall determine (i) that such restoration and/or foreclosure or forfeiture will increase the proceeds of liquidation of the Real Estate Interest to Unitholders after reimbursement to itself for such expenses and (ii) that such expenses will be recoverable by it either through liquidation proceeds (respecting which it shall have priority for purposes of withdrawals from the Pool Account) or through insurance proceeds (respecting which it shall have similar priority). MCA shall be entitled to recover (but only from the cash flow resulting from the Real Estate Interests in a particular Pool) any and all of the foregoing expenses and any legal expenses incurred in connection with foreclosure or forfeiture proceedings whether or not the Real Estate Interest is reinstated, whether or not such proceedings are terminated prior to completion, and whether or not such sums are received from the obligor for such expenses or recovered from the liquidation of the Real Estate Interest's collateral. The Trustee shall have no duty to expend its own funds in any manner or for any purpose in the event of any delinquency with respect to one or more Real Estate Interests.

7.    Establishment of Pool Account.  (a)  For each Pool of Real Estate Interests hereafter created, MCA shall establish and maintain a separate custodial account or accounts for the benefit of holders of Units representing interests in such Pool, to be designated as the "Pool Account for Series 19_-_ Pool," into which MCA shall deposit on a monthly basis, except as permitted in the last paragraph of this Subsection (a), the following payments and collections received or made by it subsequent to the Cut-off Date:

(i)    All scheduled payments received after the Cut-off Date on account of principal on the Real Estate Interests, and all principal prepayments collected after the Cut-off Date;

(ii)    All payments on account of interest on the Real Estate Interests;

(iii)    All liquidation proceeds;

(iv)    All proceeds received by MCA under any title, hazard or other insurance policy, other than proceeds to be held in the Escrow Account and applied to the restoration or repair of the subject property or released to the Obligor in accordance with MCA's normal servicing procedures; and

(v)    All awards or settlements in respect of condemnation proceedings affecting any subject property which are not released to the Obligor in accordance with MCA's normal servicing procedures.

5

(vi)     All proceeds resulting from the sale of properties received upon or in lieu of forfeiture or foreclosure of a Real Estate Interest.

The foregoing requirements for deposit in the Pool Accounts shall be exclusive, it being understood and agreed that, without limiting the generality of the foregoing, payments in the nature of prepayment or late payment charges or assumption fees need not be deposited by MCA in the Pool Account and may be retained by MCA as additional servicing compensation. In the event MCA shall deposit into the Pool Account any amount not required to be deposited therein, it may at any time withdraw such amount from the Pool Account, any provision herein to the contrary notwithstanding.

(b)     MCA may, from time to time, withdraw funds from the Pool Account for the following purposes:

(i)     to pay to the Trustee all fees, charges and expenses owing on account of this Agreement;

(ii)     to make payments to the Unitholders in the amounts and in the manner provided for in Section 9;

(iii)     to reimburse itself for any unpaid servicing fee and for unreimbursed advances of MCA funds made pursuant to Section 6 or Section 9;

(iv)     to pay, or reimburse itself or the Trustee for payment of, expenses, taxes and other charges incurred by and/or reimbursable to it pursuant to Section 8;

(v)     to pay principal and interest due on Senior Liens;

(vi)     to pay any required amounts due to escrow accounts with respect to the Real Estate Interests or any Senior Lien;

(vii)     to terminate the Pool Account upon the termination of this Agreement.

The Trustee shall have no responsibility to assure itself or Unitholders that MCA has withdrawn funds for the purposes permitted herein, and shall be entitled to rely on any certification or assurance from MCA with respect to the withdrawal of monies from a Pool Account. The Trustee shall have no responsibility for any of the duties enumerated in this subsection (b).

(c)     MCA may under certain circumstances establish a single custodial account or series of accounts for the benefit of various Pools of Real Estate Interests sponsored by MCA. MCA may then use such single custodial account or series of accounts as the Pool Account, and may commingle funds in such single account or accounts from the Pool with funds from other such pools. MCA shall under such circumstances (i) maintain adequate bookkeeping records to account for the ownership of funds among the various pools and (ii) be prohibited from withdrawing funds from such account or series of accounts to pay expenses or make distributions in respect of any individual pool in excess of the deposits made therein for such pool. Funds which accumulate in such account or series of accounts between distribution dates shall be allocated to the various pools in accordance with average balances for each pool in such account or series of accounts. MCA shall not establish one or more custodial accounts in reliance on this paragraph (c), unless MCA shall have determined, based on advice of counsel, that the commingling of funds would not subject the assets of one pool to creditors asserting claims against any other pool or person, would not compromise the tax status of any pool as a fixed investment trust, and would result in significant benefits to the pools due to reduced transaction costs and/or higher interest payments. The Trustee shall have no responsibility for any of the duties enumerated in this subsection (c).

8.     Payment of Taxes, Insurance and Other Charges. With respect to each Real Estate Interest which imposes such a duty on the record owner of Real Estate Interests, MCA shall maintain accurate records reflecting the status of taxes and other charges which are or may become a lien upon the subject property and the status of any primary

6

mortgage guaranty insurance premiums and fire and hazard insurance coverage and shall obtain, from time to time, all bills for the payment of such charges (including renewal premiums) and shall effect payment thereof on behalf of the Unitholders prior to the applicable penalty or termination date. Upon request by the Trustee, MCA will furnish such information concerning the status of such matters as is specified by the Trustee. Consistent with the foregoing provisions of this Section 8 regarding MCA's duty to maintain accurate records, obtain bills, and effect payment thereof, and notwithstanding the record ownership of the Real Estate Interests, the Trustee shall have no responsibility for the payments enumerated in this Section 8 and no liability in the event of MCA's failure to effect such payments.

9.    **Payments to Unitholders.** (a) On each Distribution Date, MCA shall pay by check to Unitholders of record of each Pool on the preceding Record Date each such Unitholder's pro rata share (based on the aggregate participation interests represented by Unit Certificates held by such Unitholder) of all amounts deposited in the Pool Account for such Pool during the calendar quarter preceding the Distribution Date and which represent payments of the nature required to be distributed on such Distribution Date pursuant to the Certificate.

(b)    Not later than twenty days following each Distribution Date, MCA will furnish to each Unitholder by first class mail a statement setting forth, as to the preceding remittance and the period ending on the preceding Determination Date, as to each Unitholder's interest in the Pool (i) the amount of such remittance allocable to principal, and (ii) the aggregate of the stated principal balances of the Real Estate Interests as of the last day of the calendar quarter for which the distribution is made.

(c)    In addition, within a reasonable period of time after the end of each calendar year, MCA will furnish to each holder of a Unit Certificate at any time during such calendar year written information as to (i) the amount of distributions made during such year that is allocable to interest and amortized discounts (amortization of discount shall be made either ratably in accordance with the contractual life of the Real Estate Interests in the Pool or pursuant to any other method, determined by MCA in its discretion, consistent with the Internal Revenue Code of 1986 and other applicable law) and (ii) the amount of related servicing compensation from all sources paid to MCA and such other customary information as MCA deems necessary or desirable to enable Unitholders to prepare their tax returns, including the amount of amortized fees attributed to the calendar year, (iii) the aggregate of remittances for the applicable portion of such year, an annual statement in accordance with the requirements of applicable federal income tax law and (iv) a listing of the principal balances of the Real Estate Interests outstanding at the end of such calendar year. In addition, upon request of a holder of a Unit Certificate, MCA will mail to such holder the most recent balance sheet and related financial statements of MCA. The Trustee shall have no responsibility for any of the duties enumerated in this paragraph.

(d)    If the actual amount of cash distributed with respect to a particular Pool during any calendar year to Unitholders other than MCA is less than the amount which would have been distributed with respect to such Pool had all payments on the Real Estate Interests been made when due, MCA shall make cash advances, which shall in no event be greater than an amount equal to any quarterly distributions to which it may be entitled as a 5.0% Unitholder, in the next succeeding year until the amount of any shortfall in a prior year's cash distributions to the other Unitholders has been made up. MCA shall be entitled to recover its advances if delinquent payments are received from the Real Estate Interests in that Pool at a later date such that there is an excess of cash received in any particular calendar quarter and available for distribution over that which would have been distributed had all payments on the Real Estate Interests been made when due. MCA shall indemnify and hold the Trustee harmless from any claims by Unitholders with respect to the management of cash distributions as provided in this paragraph.

(e)    Other than as provided in paragraph 9(d), MCA shall not be obligated to advance additional funds to remedy any remaining deficiency in expected distributions to other Unitholders. However, MCA may in its discretion elect to do so, and in such event such additional advances shall be disclosed in quarterly reports to Unitholders, and in any subsequent quarter or quarters thereafter MCA may elect to withhold all or any part of distributions due to Unitholders in order to reimburse itself for such discretionary additional advances.

10.    **Servicing Compensation; Trustee Compensation.** (a) As compensation for its services hereunder, MCA shall be entitled to withdraw each month from the Pool Account an amount equal to one-twelfth of the product of (i) the

7

Annual Servicing Fee designated in the Confidential Memorandum Supplement for a particular Pool multiplied by (ii) the aggregate Net Receivables outstanding on the first day of such month. Additional servicing compensation in the form of all late payment charges assessed against Obligors, or other forms of servicing compensation permitted by this Agreement shall be retained by MCA to the extent not required to be deposited in the Pool Account. Other than as provided in Section 6 or elsewhere herein, MCA shall be required to pay all expenses incurred by it in connection with its servicing activities hereunder and shall not be entitled to reimbursement therefor except as specifically provided for.

(b) The Trustee shall be compensated in accordance with the fee schedule attached hereto. The compensation of the Trustee may be revised from time to time by mutual agreement of the parties hereto.

11.     Indemnification.  MCA and MCA Properties, jointly and severally, agree to indemnify the Trustee and each Unitholder and hold them harmless against any and all claims, losses, penalties, fines, forfeitures, legal fees and related costs, judgments, and any other costs, fees and expenses that the Trustee or any Unitholder may sustain in any way related to the failure of MCA or MCA Properties to perform their duties in compliance with the terms of this Agreement.  MCA shall immediately notify the Unitholders if a claim is made by a third party with respect to this Agreement or the Real Estate Interests held in a particular Pool, shall assume (unless instructed to the contrary by Unitholders owning at least 50% in face amount of all Unit Certificates relating to a particular Pool and not held by MCA or its affiliates) the defense of any such claim, shall pay all expenses in connection therewith, including counsel fees, and shall promptly pay, discharge and satisfy any judgment or decree which may be entered against the Trustee, MCA Properties or any Unitholder in respect of such claim.  The Unitholders of an affected Pool shall promptly reimburse MCA pro rata (but only out of the cash flow from such Pool) for all amounts advanced by it pursuant to the preceding sentence, except when the claim in any way relates to MCA's failure to service and administer the Real Estate Interests in compliance with the terms of this Agreement.

12.     Limitation on Liability of MCA, MCA Properties, the Trustee and Others.  (a) Neither MCA nor MCA Properties, nor any of their respective directors, officers, employees or agents shall be under any liability to the Trustee or any Unitholder for any action taken or for refraining from the taking of any action in good faith pursuant to this Agreement, or for errors in judgment; provided, however, that this provision shall not protect MCA or MCA Properties against any failure to perform its obligations in compliance with any standard of care set forth in this Agreement, or any liability which would otherwise be imposed by reason of any breach of the terms and conditions of this Agreement. MCA, MCA Properties, and their respective directors, officers, employees and agents may rely in good faith on any document of any kind properly executed and submitted by any person respecting any matters arising hereunder.  Except as provided in Section 11, neither MCA nor MCA Properties shall be under any obligation to appear in, prosecute or defend any legal action which is not incidental to MCA's duties to service the Real Estate Interests in accordance with this Agreement or MCA Properties' duties to act as Nominee Agent, and which in its respective opinion, may involve it in any expenses or liability; provided, however, that either MCA or MCA Properties may in its discretion undertake any such action which it may deem necessary or desirable in respect to this Agreement and the rights and duties of the parties hereto.  In such event, the legal expenses and costs of such action and any liability resulting therefrom shall be expenses, costs and liabilities payable from the Pool Account for the affected Pool and MCA and MCA Properties shall be entitled to be reimbursed therefor out of such Pool Account as provided herein.

(b)     The Trustee is not the agent of MCA or MCA Properties for the performance of any obligation, duty, service, or act which MCA or MCA Properties is directed to perform hereunder.  The Trustee shall be obligated to perform only those duties which are expressly set forth in this Agreement.  No implied covenants or agreements shall be read into this Agreement against the Trustee.  No other person or entity is a beneficiary of this Agreement.  The Trustee shall have no responsibility to assure itself or Unitholders that MCA or MCA Properties has performed any obligation, duty, service, or act which either MCA or MCA Properties is directed to perform hereunder.  The Trustee may consult with legal counsel of its choice regarding the performance of its duties hereunder, and the advice or opinion of legal counsel as to matters of law shall be full and complete authorization and protection with respect to any action taken, suffered, or omitted in good faith and in accordance with the advice or opinion of legal counsel.  Neither the Trustee nor any of its directors, officers, employees or agents shall be liable to MCA, MCA Properties or any Unitholder

8

for any action taken, suffered, or omitted by it or them which is reasonably believed by it or them to be authorized or within the discretion, rights, or powers granted by or necessary to fulfill the terms of this Agreement.

13. <u>Events of Default</u>. In case one or more of the following Events of Default by MCA shall occur and be continuing, that is to say:

(a) any failure to remit to the Unitholders any payment required to be made under the terms of this Agreement which continues unremedied for a period of 20 days after the date upon which written notice of such failure, requiring the same to be remedied, shall have been given to MCA by any Unitholder; or

(b) failure on the part of MCA duly to observe or perform in any material respect any other of the covenants or agreements on the part of MCA set forth in this Agreement which continues unremedied for a period of 60 days after the date on which written notice of such failure, requiring the same to be remedied, shall have been given to MCA by any Unitholder; or

(c) failure on the part of MCA to observe or perform in any respect all the duties and obligations imposed upon it by Section 7(c) regarding the establishment of Pool Accounts; or

(d) a decree or order of a court or agency or supervisory authority having jurisdiction for the appointment of a conservator or receiver or liquidator in any insolvency, readjustment of debt, marshaling of assets and liabilities or similar proceedings, or for the winding-up or liquidation of its affairs, shall have been entered against MCA and such decree or order shall have been entered against MCA and such decree or order shall have remained in force undischarged or unstayed for a period of 60 days; or

(e) MCA shall consent to the appointment of a conservator or receiver or liquidator in any insolvency, readjustment of debt, marshalling of assets and liabilities or similar proceedings of or relating to MCA or of or relating to all or substantially all of its property; or

(f) MCA shall admit in writing its inability to pay its debts generally as they become due, file a petition to take advantage of any applicable insolvency or reorganization statute, make an assignment for the benefit of its creditors, or voluntarily suspend payment of its obligations;

(g) MCA shall, after the closing of a sale of a Unit Certificate to an Investor and the execution of this Agreement, trade, reinvest or substitute any Real Estate Interest or other asset in which the Investors have or are intended to have an equitable interest (other than (i) the placement of cash proceeds in an interest-bearing account pending their distribution and (ii) the repurchase of Unit Certificates pursuant to Section 15 of this Agreement);

then, and in each and every such case, so long as an Event of Default shall not have been remedied, the Trustee may, and at the written direction of Unitholders holding at least 50% of the aggregate amount of Net Receivables held in a particular Pool the Trustee shall, by notice in writing to MCA and all other Unitholders of such Pool, in addition to whatever rights the Unitholders may have at law or in equity to damages, terminate all the rights and obligations of MCA under this Agreement and in and to the Real Estate Interests held in such Pool and the proceeds thereof (other than MCA's interests in the Pool as a Unitholder). On or after the receipt by MCA of such written notice, all authority and power of MCA under this Agreement with respect to the Real Estate Interests held in such Pool, shall pass to and be vested in the successor servicing agent appointed pursuant to Section 16. Upon written request from the Trustee, MCA shall prepare, execute and deliver any and all documents and other instruments and place in such successor's possession all files relating to the Real Estate Interests held in such Pool and do or accomplish all other acts or things necessary or appropriate to effect the purposes of such notice of termination, whether to complete the transfer and endorsement or assignment of the Real Estate Interests and related documents, or otherwise, at MCA's sole expense. MCA agrees to cooperate with the Trustee and such successor servicing agent in effecting the termination of MCA's responsibilities and rights hereunder, including, without limitation, the transfer to such successor for administration by it of all cash amounts which shall at the time be credited by MCA to the Pool Account or Escrow Account (if any) or thereafter received with

9

respect to the Real Estate Interests held in such Pool. Unitholders with respect to such Pool, other than MCA and its affiliates, owning at least 50% in face amount of all Unit Certificates not held by MCA or its affiliates, may, on behalf of all Unitholders, waive any default by MCA in the performance of its obligations hereunder and its consequences, except that a default under Paragraphs (a) or (g) of this Section 13 may only be waived by all Unitholders. Upon any such waiver of a past default, such default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been remedied for every purpose of this Agreement. No such waiver shall extend to any subsequent or other default or impair any right consequent thereon except to the extent expressly so waived.

14. __Termination.__ As to the Unit Certificates issued hereunder with respect to a particular Pool of Real Estate Interests, the obligations and responsibilities of MCA created hereby (other than the obligation of MCA to make payments to Unitholders as herein set forth) shall terminate upon: (a) the repurchase by MCA, pursuant to Section 15, of all outstanding Unit Certificates with respect to such Pool; or (b) the later of the final payment or other liquidation (or any advance with respect thereto) of the last Real Estate Interest held in such Pool or the disposition of all property acquired upon foreclosure or forfeiture of any Real Estate Interest held in such Pool.

15. __Repurchase Option and Obligations.__ The option is hereby granted to MCA to repurchase all outstanding Unit Certificates with respect to a particular Pool of Real Estate Interests, and a reciprocal obligation is hereby imposed on each Unitholder to sell to MCA his or her Units at a price equal to (i) his or her percentage interest in the Pool times (ii) 100% of the Repurchase Price on the first day of the month of repurchase (after giving effect to any principal payment due on such first day); provided that the right of MCA to exercise this repurchase option shall exist only if the aggregate amount of principal owing with respect to all Real Estate Interests held in such Pool has declined to less than 20% of the aggregate outstanding principal balances of the Real Estate Interests held in such Pool at the Cut-off Date. In addition, MCA shall be obligated to repurchase all outstanding Units with respect to a particular Pool of Real Estate Interests, and each Unitholder shall be obligated to sell to MCA his or her Units, at the foregoing price provided (i) that the aggregate amount of principal owing with respect to all Real Estate Interests held in such Pool has declined to less than 10% of the aggregate outstanding principal balances of the Real Estate Interests held in such Pool at the Cut-off Date and (ii) that no Real Estate Interest held in such Pool is in foreclosure or otherwise in default. In executing its rights or obligations under this Section 15, MCA shall give each Unitholder not less than three days' notice of the anticipated repurchase. Such repurchase shall be effected automatically and without further action by any party upon receipt by the Unitholders of all payments required under this Section 15.

16. __Successor to MCA.__ Prior to any termination of MCA's responsibilities and duties as servicing agent as provided under this Agreement, the Trustee shall, on behalf of all Unitholders, either (i) succeed to and assume all of MCA's responsibilities, rights, duties and obligations under this Agreement, or (ii) appoint a successor servicing agent having a net worth of not less than $500,000 which shall succeed to all rights and assume all of the responsibilities, duties and liabilities of MCA under this Agreement prior to the termination of MCA's responsibilities, duties and liabilities under this Agreement. In connection with such appointment and assumption, the Trustee may make such arrangements for the compensation of such successor servicing agent out of payments on Real Estate Interests as it and such successor shall agree. In the event that MCA's duties, responsibilities and liabilities under this Agreement should be terminated with respect to a particular Pool or Real Estate Interests, MCA shall discharge such duties and responsibilities during the period from the date it acquires knowledge of such termination until the effective date thereof with the same degree of diligence and prudence which it is obligated to exercise under this Agreement, and shall take no action whatsoever that might impair or prejudice the rights or financial condition of its successor.

Any successor servicing agent appointed as provided herein shall execute, acknowledge and deliver to the Trustee an instrument accepting such appointment and agreeing to hold harmless the Trustee from any claims arising out of or based upon facts or events occurring after its appointment, whereupon such successor shall become fully vested with all the rights, powers, duties, responsibilities, obligations and liabilities of MCA, with like effect as if originally named as a party to this Agreement and the Certificates. Any termination of MCA or this Agreement shall not affect any claims that the Unitholders or any Unitholder may have against MCA arising prior to any such termination or resignation.

10

MCA shall timely deliver to the successor servicing agent the funds in the Pool Account and the files and related documents and statements held by it hereunder and MCA shall account for all funds and shall execute and deliver such instruments and do such other things as may reasonably be required to more fully and definitely vest and confirm in the successor all such rights, powers, duties, responsibilities, obligations and liabilities of MCA.  Upon a successor's acceptance of appointment as such, the Trustee shall notify by mail all Unitholders of such appointment.

17.    Concerning the Trustee; Resignation and Removal; Successor.

(a)    There shall at all times be a Trustee hereunder which shall be a corporation organized and doing business under the laws of the United States of America or of any State, authorized under such laws to exercise corporate trust powers, having a combined capital and surplus of at least $10,000,000, subject to supervision or examination by federal or state authority.  If such corporation publishes reports of condition at least annually, pursuant to law or to the requirements of supervising or examining authority, then for the purpose of this Section, the combined capital and surplus of such corporation shall be deemed to be its combined capital and surplus as set forth in its most recent report of condition so published.  If at any time the Trustee shall cease to be eligible in accordance with the provisions of this Section, it shall resign immediately in the manner and with the effect hereinafter specified in this Section.

(b)    No resignation or removal of the Trustee and no appointment of a successor Trustee pursuant to this Section shall become effective until the acceptance of appointment by the successor Trustee under Section 17(c) below.  The Trustee may resign at any time by giving written notice thereof to MCA.  If an instrument of acceptance by a successor Trustee shall not have been delivered to the Trustee within 30 days after the giving of such notice of resignation, the resigning Trustee may petition any court of competent jurisdiction for the appointment of a successor Trustee.  The Trustee may be removed at any time by holders of a majority in principal amount of the outstanding Real Estate Interests, upon notice of removal, delivered to the Trustee and to MCA.  If at any time the Trustee shall cease to be eligible under Section 17(a) above and shall fail to resign after written request therefor by MCA, or the Trustee shall become incapable of acting or shall be adjudged a bankrupt or insolvent or a receiver or conservator of the Trustee or of its property shall be appointed or any public officer shall take charge or control of the Trustee or of its property or affairs for the purpose of rehabilitation, conservation or liquidation, then, in any such case, MCA may remove the Trustee.

(c)    If the Trustee shall resign, be removed or become incapable of acting, or if a vacancy shall occur in the office of Trustee for any cause, MCA shall promptly appoint a successor Trustee.  If no successor Trustee shall have been so appointed by MCA and accepted appointment in the manner hereinafter provided, any Unitholder who has been a bona fide Unitholder for at least six months may, on behalf of himself and all others similarly situated, petition any court of competent jurisdiction for the appointment of a successor Trustee.  MCA shall give notice of the resignation or removal of the Trustee and each appointment of a successor Trustee by mailing written notice of such event within 30 days of the date thereof by first-class mail, postage prepaid, to the Unitholders as their names and addresses appear in the records maintained by MCA.  Each notice shall include the name of the successor Trustee and the address of its principal corporate trust office.

(d)    Every successor Trustee appointed hereunder shall execute, acknowledge and deliver to MCA and to the retiring Trustee an instrument accepting such appointment, and thereupon the resignation or removal of the retiring Trustee shall become effective and such successor Trustee, without any further act, deed or conveyance, shall become vested with all the rights, powers, trusts and duties of the retiring Trustee; but, on request of MCA or the successor Trustee, such retiring Trustee shall, upon payment of its charges, execute and deliver an instrument transferring to such successor Trustee all the rights, powers and trusts of the retiring Trustee, and shall duly assign, transfer and deliver to such successor Trustee all property and money held by such retiring Trustee hereunder.  Upon request of any such successor Trustee, MCA shall execute any and all instruments for more fully and certainly vesting in and confirming to such successor Trustee all such rights, powers and trusts.

(e)    Any corporation or banking association into which the Trustee may be merged or converted or with which it may be consolidated, or any corporation or banking association resulting from any merger, conversion or

11

consolidation to which the Trustee shall be a party, or any corporation succeeding to all or substantially all of the corporate trust business of the Trustee, shall be the successor of the Trustee hereunder, provided such corporation or banking association shall be otherwise qualified and eligible under this Section 17 to the extent operative, without the execution or filing of any paper or any further act on the part of any of the parties hereto.

18.     Amendment.  This Agreement may be amended from time to time without the consent of Unitholders to cure any ambiguity, or to correct any provision therein which may be inconsistent with any other provision therein; provided that such action shall not adversely affect, in any material respect, the interests of any Unitholder.  In addition, this Agreement may be amended from time to time, but only with the consent of Unitholders owning not less than 50% in face amount of all Unit Certificates, for the purpose of adding, changing, or eliminating any of the provisions of this Agreement or of modifying in any manner the rights of the holders of Units; provided, however, that such amendment shall not without the consent of all adversely affected Unitholders (i) reduce in any manner the payments to be received on the Real Estate Interests or (ii) reduce the percentage of Unitholders in the Pool required to consent to any such amendment.

19.     Governing Law.  This Agreement shall be construed in accordance with the laws of the State of Michigan and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with such laws.

20.     Notices.  All demands, notices and communications hereunder shall be in writing and shall be deemed to have been duly given if personally delivered at or mailed by registered or certified mail, postage prepaid, to (a) in the case of MCA to 24700 Northwestern Highway, Southfield, Michigan 48075, Attention: Cheryl A. Swain, and (b) in the case of the Trustee to One Towne Square, 17th Floor, Southfield, Michigan 48076, Attention: John C. Denyer, Executive Managing Director of Commercial Operations.  Notwithstanding the foregoing, monthly remittance advices and other routine servicing communications shall be deemed delivered when deposited in first class mail.

21.     Severability of Provisions.  If any one or more of the covenants, agreements, provisions or terms of this Agreement shall be for any reason whatsoever held invalid, then such covenants, agreements, provisions or terms shall be deemed severable from the remaining covenants, agreements, provisions or terms of this Agreement and shall in no way affect the validity or enforceability of the other provisions of this Agreement.

22.     No Partnership.  Nothing herein contained shall be deemed or construed to create a co-partnership or joint venture between the parties hereto and the services of MCA shall be rendered as an independent contractor and not as agent for Unitholders or the Trustee.

23.     Counterparts.  This Agreement may be executed simultaneously in any number of counterparts, each of which shall be deemed to be an original, and such counterparts shall constitute but one and the same instrument.

12

IN WITNESS WHEREOF, MCA and the Trustee have executed this Agreement as of the day and year first above written.

MORTGAGE CORPORATION OF AMERICA

By: /S/ CHERYL A. SWAIN
    Cheryl A. Swain
    Vice President


STERLING BANK AND TRUST, FSB

By: /S/ JOHN C. DENYER
    John C. Denyer
    Executive Managing Director of Commercial Operations


MCA PROPERTIES, INC.

By: /S/ CHERYL A. SWAIN
    Cheryl A. Swain
    Vice President

13

| STATE OF MICHIGAN<br>3rd JUDICIAL COURT<br>WAYNE COUNTY | REQUEST FOR HEARING<br>ON A MOTION<br>(PRAECIPE)<br>ORDER/JUDGMENT | CASE NO.<br><br>00- |
|---|---|---|

| PLAINTIFF NAME (S)<br>    Ronnie Hagel, et al.<br><br>PLAINTIFF'S ATTORNEY, BAR NO.,<br>ADDRESS, AND TELEPHONE NO.<br><br>  Jerome G. Quinn (P19156)<br>  Law Offices of Jerome G. Quinn, P.C.<br>  74 W. Long Lake Rd., #203<br>  Bloomfield Hills, MI  48304<br>  (248) 642-0023 | VS. | DEFENDANT NAME (S)<br><br>  Sterling Bank & Trust, et al.<br>DEFENDANT'S ATTORNEY, BAR NO.,<br>ADDRESS AND TELEPHONE NO. |

List additional attorneys on other side)

1.  Motion Title:    Motion for Certification of Action as a Class Action

2.  Moving Party:    Plainitff         Telephone No.   248-642-0023

3.  Please place on the motion calendar for:

| Judge<br>PAUL TerAneS | Bar No. | Date<br>10/13/00 | Time<br>8:30 |
|---|---|---|---|

Adj. to: _____  Adj. to: _____  Adj. to: _____

4.  I certify that I have made personal contact with _Not possible to contact_ on _____ regarding concurrence in relief sought in this motion and that concurrence has been denied or that I have made reasonable concurrence with motion.

Date  8/25/00  Attorney _____  Bar No. P19156

ORDER/JUDGMENT

DATED: _____

IT IS ORDERED THAT THIS MOTION IS:

☐ DENIED   ☐ GRANTED IN PART/DENIED IN PART   ☐ TAKEN UNDER ADVISEMENT   ☐ DISMISSED

☐ GRANTED AND IT IS FURTHER ORDERED AND ADJUDGED:

Approved as to form and substance by Counsel for:

Plaintiff _____

Defendant _____

Date _____

_____<br>CIRCUIT JUDGE

FILE EITHER IN PERSON OR BY MAIL<br>WITH:   JAMES R. KILLEEN,<br>      WAYNE COUNTY CLERK<br>      201 City-County Building<br>      Detroit, Michigan  48226



## STATE OF MICHIGAN
## CIRCUIT COURT FOR THE COUNTY OF WAYNE

RONNIE HAGEL, JUDY AND
ROBERT WILSON, FELIPE LOZANO JR.
KENNETH HUNTER, JAMES AND
PATRICIA MOODY, DR. JOHN NATSIS
DOROTHY HUNTER and DONNA BOROVICH,
Individually and on Behalf of All Persons
Similarly Situated,

           Plaintiffs,

           vs.

STERLING BANK AND TRUST, FSB;
ALEXANDER J. AJEMIAN;
PATRICK D. QUINLAN; LEE P. WELLS;
C. THOMAS WELLS, JR., KEITH D. PIETIELA;
JAMES B. QUINLAN; D. MICHEAL JEHLE;
RONALD B. DARGA; JOHN P. O'LEARY;
DENNIS AGRESTA; ARLENE A. DOYLE;
DANIEL J. O'CONNOR; and CHERYL SWAIN,
Jointly and Severally,

           Defendants.

Case No: 00-
Hon:

---

| Jerome G. Quinn (P19156) | Larry G. Mason (P17183) |
|---|---|
| Attorneys for Plaintiffs | Co-Counsel for Plaintiffs |
| 74 W. Long Lake Rd. | Larry G. Mason, P.C. |
| Suite 203 | 1530 Rochester Rd. |
| Bloomfield Hills, MI 48304 | Royal Oak, MI 48067 |
| (248) 642-0023 | (248) 547-5310 |

---

### NOTICE OF HEARING

PLEASE TAKE NOTICE that the attached Motion for Certification of Action as a

Class Action will be heard on **Friday, the 13th day of October, 2000 at 8:30 a.m.,** or as

soon thereafter as counsel can be heard, before Hon. Judge _Teranes_ in the Circuit

Court for the County of Wayne, City County Bldg., 2 Woodward Ave., Detroit, MI 48226.



LAW OFFICES OF JEROME G. QUINN, P.C.

JEROME G. QUINN (P19156)
Attorney for Plaintiffs
74 West Long Lake Rd., Suite 203
Bloomfield Hills, Michigan 48304
(248) 642-0023

Dated:  August 23, 2000